RESOLUTION TRUST CORPORATION, as receiver of Nassau Savings and Loan Association, F.A., Plaintiff,

v.

Selma DIAMOND, Ira Kaufman, Jerome Lederer, Peggy Lehman, Susan Solomon Pattullo, Lloyd Ribner, as Executor of the Estate of Muriel Ribner, Deceased, Horace Solomon, Lillian Solomon, Denise Tucker, Angelo Aponte, Commissioner of the Division of Housing and Community Renewal of the State of New York, and Robert Abrams, Attorney General of the State of New York, Defendants.

Robert ABRAMS, Attorney General of the State of New York, and New York State Division of Housing and Community Renewal, Plaintiffs,

v.

RESOLUTION TRUST CORPORATION, Nassau Savings and Loan Association, F.A., Jerome Maron, and Anthony T.S. Conrad, Defendants.

Nos. 91 Civ. 1361 (RLC), 91 Civ. 1683 (RLC).

United States District Court, S.D. New York.

July 3, 1991.

---

Nixon, Hargrave, Devans & Doyle, New York City for Resolution Trust Corp., Jerome Maron, and Anthony T.S. Conrad (Frank H. Penski, of counsel).

Robert Abrams, Atty. Gen. of State of N.Y., New York City, for Robert Abrams and New York State Div. of Housing and Community Renewal (Frederick K. Mehlman and Karen Smith, Asst. Attys. Gen., of counsel).

Wien, Malkin & Bettex, New York City, for Selma Diamond, Ira Kaufman, Jerome Lederer, Peggy Lehman, Horace Solomon, Lillian Soloman, and Denise Tucker (Robert Machleder, of counsel).

Buchwald & Kaufman, New York City, for Susan Solomon Pattullo (Don D. Buchwald, of counsel).

Behar & Greer, New York City, for Lloyd Ribner, Executor (Leon I. Behar, of counsel).

ROBERT L. CARTER, District Judge.

On February 25, 1991, the Resolution Trust Corporation (the "RTC"), as receiver of Nassau Savings and Loan Association, F.A. ("Nassau Savings"), brought a declaratory judgment action, No. 91 Civ. 1361 (RLC), against Angelo Aponte, the Commissioner of the Division of Housing and Community Renewal of the State of New York (the "DHCR"); Robert Abrams, the Attorney General of the State of New York

(the "A.G."); and the lessees of nine condominium units located at 444 East 57th Street, New York, New York (the "East 57th Street units") that the RTC had acquired as a result of the failure of Nassau Federal Savings and Loan Association ("Nassau Federal").[1]

The RTC, which was established by Congress for the purposes of managing and disposing of the assets of failed savings and loan institutions, seeks to establish that as a general matter, it has the right, under the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"), Pub.L. 101–73, 103 Stat. 183; 12 U.S.C. § 1441a(b), to disaffirm and repudiate condominium and cooperative unit leases and tenancies; that pursuant to the Supremacy Clause of Article VI of the United States Constitution, the RTC has the right to sell, lease, maintain and otherwise exercise control over the East 57th Street units free and clear of any exercise of authority by the DHCR under Article 2 of New York's Public Housing Law, the regulations enacted thereunder, or other laws and regulations of the State of New York; and that, also pursuant to the Supremacy Clause, the RTC has the right to sell, lease, maintain and otherwise exercise control over the East 57th Street units free and clear of any exercise of authority by the A.G. under the Martin Act, N.Y.Gen. Bus.Law, §§ 352 *et seq.*

On March 13, 1991, the A.G. and the DHCR (collectively the "A.G.") commenced their own action, No. 91 Civ. 1683 (RLC), challenging the RTC's authority to disregard New York State's comprehensive statutory scheme regulating the rights of rental tenants during and after condominium and cooperative conversions. At a pretrial conference on May 21, 1991, the court consolidated the two actions for all purposes in light of the similarity of factual and legal issues that they presented.

At that conference, the court made an initial determination that discovery in the now-consolidated actions should be limited to the facts and events relating to the RTC's disaffirmance and repudiation of the leases of the East 57th Street units. In addition, the court ordered the RTC to produce documents, on or before May 30, 1991, that were responsive to the A.G.'s prior discovery request; directed the A.G. to advise the RTC, on or before June 14, 1991, of the specific individuals he wished to depose and any additional documents he wished to have the RTC produce; and to the extent that discovery issues remained in dispute, directed the parties to express their views to the court in writing by June 21, 1991, and to appear for a conference with the court on these unresolved issues on July 1, 1991.

Based upon the factual circumstances and legal positions presented to the court both in writing and during the conference held on July 1, 1991, the court made oral rulings on all of these disputed issues. In the interest of providing the parties with more guidance on how best to proceed toward a just and timely resolution of these cases, particularly in view of the pressing questions of public policy that these cases raise, the court herein sets forth its rulings in greater detail.

## I. *Scope of Discovery*

Central to both sides' claims in these two cases is the "Statement of Policy for the Disposition of Residential Units Which Were Previously Subject to Rent or Securities Regulation" (the "policy statement"), which the RTC issued on February 22, 1991. The policy statement declares, in relevant part:

    1. The policy of the RTC will be to exercise its disaffirmance or repudiation

---

**1.** On March 16, 1990, by Resolution Number 90–518, the Office of Thrift Supervision of the United States Department of the Treasury appointed the RTC as receiver of Nassau Federal, which was a failed institution that had been insured by the Federal Savings and Loan Insurance Corporation. On the same day, pursuant to section 5(d)(2)(H)(ii) of the Home Owner's Loan Act of

1933, 12 U.S.C. § 1464(d), the RTC, as receiver of Nassau Federal, organized a new federal association, Nassau Savings, for the purposes of taking over the assets and assuming certain liabilities of Nassau Federal, including the nine East 57th Street units which are at issue in the RTC's present action.

powers with regards [*sic*] to these units when it determines that: 1) the insured depository institution is a party to the lease; 2) the performance of which the conservator or receiver determines, in its discretion, to be burdensome; and 3) ... the disaffirmance or repudiation of which the conservator or receiver determines, in its discretion, will promote the orderly administration of the institution's affairs.

.　.　.　.　.

2. Where the RTC finds that units are leased by low or moderate income tenants, the RTC will not exercise its disaffirmance or repudiation powers with respect to those units. For this purpose, a low or moderate income tenant is defined as a family or individual whose income does not exceed one hundred and fifteen percent (115%) of the median income in the area involved....

3. Where the RTC determines to disaffirm or repudiate the leases of such units, the RTC may, in its discretion, offer the units for sale to the existing tenants or negotiate other arrangements, on terms which the RTC finds acceptable, in accordance with its mandate to maximize recoveries on the assets of the institutions in its control. If the existing tenants decline or fail to purchase the units or to enter into any other agreement acceptable to the RTC, the RTC will be free to consummate the disaffirmance or repudiation and to take whatever action it deems appropriate for the disposition of the units.

Complaint, No. 91 Civ. 1361 (RLC), Exhibit D.

Given the broad, nationwide applicability of the policy statement, its potential effect on all cooperative and condominium units in New York State that the RTC has taken over as a result of the failure of Nassau Federal and other institutions is clear. The RTC seeks this court's determination that the RTC has complied with the statutory provisions of FIRREA in adopting its policy statement, that the RTC's authority under FIRREA thereby preempts any state law or regulation to the contrary, and that the RTC may therefore sell the East 57th Street units pursuant only to FIRREA provisions and without restraint of any law or regulation of New York State or New York City.

The A.G. challenges not only the RTC's authority to ignore state and local law in disposing of the East 57th Street units, but also the RTC's adoption of the policy statement in the first place. The A.G. points out that the statutory mandate of the RTC under FIRREA is to conduct its operations in a manner that

(i) maximizes the net present value return from the sale or other disposition of institutions [under the RTC's control] or the assets of such institutions;

(ii) minimizes the impact of such transactions on local real estate and financial markets;

(iii) makes efficient use of funds obtained from the Funding Corporation or from the Treasury;

(iv) minimizes the amount of any loss realized in the resolution of cases; and

(v) maximizes the preservation of the availability and affordability of residential real property for low and moderate-income individuals.

12 U.S.C. § 1441a(b)(3)(C). In addition, Congress directed the RTC to "fully consider the adverse economic impact on local communities" of actions it takes during its administration and liquidation of loans of any failed savings and loan institution. *Id.* § 1821(h)(1).

The A.G. claims, among other things, that the RTC has no statutory authority to repudiate any residential tenancies established and protected under New York's statutory scheme; that even if the RTC has such authority, the RTC has failed to establish the statutory requirement that the continuation of the tenancies at the East 57th Street units is burdensome; and that in adopting the policy statement, as well as seeking to disaffirm and repudiate the leases of the East 57th Street units pursuant to the policy statement, the RTC has violated its statutory obligation to conduct its operations in a manner which minimizes its actions' impact on local real estate markets, and which maximizes the availability

and affordability of residential real property for low and moderate-income households.

■ The RTC has consistently contended that the scope of discovery in these cases should be limited to its actions concerning the East 57th Street units, since the leases of these nine units are the only ones that the RTC has in fact decided to disaffirm and repudiate, and since any issue regarding the RTC's general power to disaffirm and repudiate leases under FIRREA presents purely a question of law. Although the court initially determined that discovery should be limited to the RTC's conduct respecting these nine units, it did so primarily because the A.G. had not adequately articulated his reasons for claiming that broader discovery is necessary and also on the assumption that the A.G. already had information as to the approximately 1,000 other units in New York that have been put at risk by the RTC's policy statement. However, the A.G. has since informed the court that, although he is aware of the approximate number of units that are now under the RTC's control, he does not know the locations, the names of the tenants, nor any other such basic information about any of these units.

In light of this development, and upon reconsideration of the issues at stake in these cases, the court finds unpersuasive the RTC's argument that the issue of its authority to disaffirm and repudiate leases under FIRREA is purely a question of law. At the heart of these cases is the question of whether the RTC complied with the statutory prerequisites to its exercise of authority under FIRREA. In adopting its policy statement, the RTC must have had under its consideration information about units other than the nine East 57th Street units. The RTC cannot seek this court's declaration that it complied with FIRREA's requirements when it adopted its policy statement and at the same time, be allowed to shield from discovery a huge bulk of the information that it considered or failed to consider before adopting the policy statement. Accordingly, the court concludes that the RTC must provide the A.G. with

information, to the best of its ability, about all of the units in New York State that the RTC had taken over as of February 22, 1991, when it issued its policy statement.

## II. Documents Withheld by the RTC on Grounds of Privilege

The RTC has withheld 92 documents from discovery on the basis of the deliberative process privilege, the attorney-client privilege, and/or the attorney work-product privilege. See Index—Privileged Documents [hereinafter Index], exhibit to letter from Frank H. Penski to the court, dated June 21, 1991. With the exception of items listed under numbers 89 and 90 in the RTC's index, which consist of legal memoranda and correspondence written by outside litigation counsel and which have already been conceded by the A.G. as being privileged attorney-client communications, the court finds that the RTC has failed to provide sufficient information to support a determination that any of the documents were in fact correctly withheld as privileged material.

### A. Deliberative–Process Privilege

■ For the qualified deliberative-process privilege to be invoked, a document must be both "predecisional" and "deliberative." *Hopkins v. United States Dep't of Hous. & Urban Dev.*, 929 F.2d 81, 84 (2d Cir.1991). It is "predecisional" if it was prepared in order to assist an agency decisionmaker in arriving at his or her decision. *Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*, 421 U.S. 168, 184, 95 S.Ct. 1491, 1500, 44 L.Ed.2d 57 (1975); *Hopkins, supra,* 929 F.2d at 84. It is "deliberative" if it is actually related to the process by which policies are formulated. *Id.* Thus, the focus of the privilege is on advisory opinions, recommendations and deliberations constituting part of a process by which governmental decisions and policies are formulated. *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150, 95 S.Ct. 1504, 1516, 44 L.Ed.2d 29 (1975); *Hopkins, supra,* 929 F.2d at 84–85.

The privilege does not extend to purely factual materials, *EPA v. Mink,* 410 U.S.

73, 89, 93 S.Ct. 827, 836, 35 L.Ed.2d 119 (1973); *Hopkins, supra,* 929 F.2d at 85, even if they are used in the determination of policy. *McClelland v. Andrus,* 606 F.2d 1278, 1289 (D.C.Cir.1979). It also does not protect factual findings and conclusions, as opposed to opinions and recommendations, *Adams v. United States,* 686 F.Supp. 417, 420 (S.D.N.Y.1988) (Carter, J.), nor does it protect factual material which may be severed from a deliberative report. *EPA v. Mink, supra,* 410 U.S. at 87–88, 93 S.Ct. at 836. The exercise of judgment in the formulation of a factual statement is not sufficient to lift it to the level of deliberation. *Playboy Enterprises, Inc. v. Department of Justice,* 677 F.2d 931, 935 (D.C.Cir.1982); *Adams, supra,* 686 F.Supp. at 419.

■ The privilege also does not extend to materials related to the explanation, interpretation or application of an existing policy, as opposed to the formulation of a new policy. *Mobil Oil Corp. v. Department of Energy,* 102 F.R.D. 1, 5 (N.D.N.Y.1983); *see NLRB v. Sears, supra,* 421 U.S. at 151–52, 95 S.Ct. at 1516–17. The materials that were written after the RTC adopted its policy clearly are not "predecisional" and therefore are unprivileged. *See NLRB v. Sears, supra,* 421 U.S. at 152 & n. 19, 95 S.Ct. at 1517 & n. 19.

■ The claim of deliberative-process privilege must be lodged by the head of the agency after personal consideration of the allegedly privileged material. *Mobil Oil, supra,* 102 F.R.D. at 5. Although this power may be delegated to a "subordinate with high authority," this may be done only if the head of the agency issues guidelines on the use of the privilege. *Id.* The assertion of the privilege by an attorney is therefore improper. *Mobil Oil, supra,* 102 F.R.D. at 6; *Coastal Corp. v. Duncan,* 86 F.R.D. 514, 519 (D.Del.1980). Moreover, the agency claiming the privilege must provide "precise and certain" reasons for preserving the confidentiality of the information. *Mobil Oil, supra,* 102 F.R.D. at 6; *Coastal Corp., supra,* 86 F.R.D. at 517–19;

*Black v. Sheraton Corp. of Am.,* 371 F.Supp. 97, 101 (D.D.C.1974); *see also Salisbury v. United States,* 690 F.2d 966, 971–72 (D.C.Cir.1982).

■ In this case, the affidavit by David Cooke, the Executive Director of the RTC, indicates that he has reviewed the documents withheld by the RTC's attorneys and has determined that they are predecisional and deliberative, and that release of the documents would impede the RTC's goal of resolving the affairs of Nassau Federal Savings and Loan Association. This appears to be nothing more than a *post hoc* adoption of the decisions made by the RTC's attorneys, as opposed to a personal decision that it was important to assert the privilege and withhold the information.[2] While assertion of the privilege by the agency head on the recommendation of subordinate officials is not improper, *see Peck v. United States,* 88 F.R.D. 65, 73–74 (S.D.N.Y.1980) (Stewart, J.), the circumstances of this case suggest that the decision to assert the privilege was made not by agency policymakers in consideration of the agency's interest in deliberative confidentiality, but by its outside counsel as a matter of litigation strategy. Moreover, the affidavit does not describe in any detail how the RTC's interests will be impaired by disclosure.

Additionally, the claim of privilege must specifically describe the information that is purportedly privileged. *Mobil Oil, supra,* 102 F.R.D. at 6; *Black, supra,* 371 F.Supp. at 101. A scant, uninformative description of the documents is insufficient. *Mobil Oil, supra,* 102 F.R.D. at 6. In this case, the documents are merely listed in an index by date, "addressor," addressee(s), document type, subject matter and grounds for nondisclosure. The "subject matter" column does not contain detailed descriptions of the documents, but consists of terse entries such as "Report of Presentation to Senior Credit Review Committee" or "Real Estate Budget." The court in *Mobil Oil, supra,* 102 F.R.D. at 8, found a more detailed index than the one supplied here to

---

**2.** The court notes that Cooke's affidavit was executed on June 20, 1991, long after the RTC

attorneys had asserted the deliberative-process privilege.

be insufficient, but noted that a sufficiently detailed accompanying affidavit might provide the necessary degree of specificity.

The RTC has not submitted enough information to allow the court to determine if the other materials are privileged. The RTC has only made vague, conclusory allegations of the privilege, with nothing specific to back up these allegations, in the index of assertedly privileged documents, the affidavit of David Cooke, and the statements of the RTC's attorneys at the conference.

■ It is the RTC's burden to submit specific information identifying each document and its contents, so that the court, in looking at the list of documents, can understand the basis on which the privilege is asserted. The RTC will not be allowed to shift its burden onto the court by submitting all the documents for inspection *in camera*, without more. Such a procedure would "force[ ] courts to become mindreaders—to discern without guidance what privilege claims an agency is asserting, the reasons for those claims, and then using those assumptions to determine whether the documents may be justifiably withheld." *Id.* at 6. Review of the documents *in camera*, with the guidance of specific assertions of privilege with respect to those documents, will be necessary if it is still not possible, even with the required detailed information, to determine whether the documents are privileged. *See In re Franklin Nat'l Bank Sec. Litig.*, 478 F.Supp. 577, 588 (E.D.N.Y.1979); *Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena*, 40 F.R.D. 318, 331 (D.D.C.1966), *aff'd on op. below sub nom. V.E.B. Carl Zeiss, Jena v. Clark*, 384 F.2d 979 (D.C.Cir.), *cert. denied*, 389 U.S. 952, 88 S.Ct. 334, 19 L.Ed.2d 361 (1967).

■ Moreover, the deliberative-process privilege is a qualified privilege. Its application depends on the balancing of the agency's interest in non-disclosure against the "interest of the litigants, and ultimately of society, in accurate judicial fact finding" and the "public interest in opening for scrutiny the government's decision making process." *Franklin Nat'l Bank, supra*,

478 F.Supp. at 582. The factors to be balanced include:

(i) the relevance of the evidence sought to be protected; (ii) the availability of other evidence; (iii) the "seriousness" of the litigation and the issues involved; (iv) the role of the government in the litigation; and (v) the possibility of future timidity by government employees who will be forced to recognize that their secrets are violable.

*Id.* at 583 (citations omitted). The agency's interest in non-disclosure must be evaluated in view of the purpose of the privilege, which is to protect frank discussion of legal or policy matters within the agency in order to prevent injury to the quality of agency decisions. *NLRB v. Sears, supra*, 421 U.S. at 150–51, 95 S.Ct. at 1516.

■ On the information that is before the court, the balance tips strongly in favor of the A.G. The RTC has made only conclusory allegations that it will be prejudiced by disclosure of the information. As noted above, the RTC's compliance with the statutory mandate to take certain considerations into account in its deliberations is directly in issue in the case. *See Carl Zeiss, supra*, 40 F.R.D. at 329; *Gisbert Constr. Co. v. Engeleiter*, 1991 WL 74652, 1991 U.S.Dist. LEXIS 5827, No. 90 Civ. 5803 (PKL) (S.D.N.Y. May 1, 1991) (Francis, Mag. J.). Also, the information sought, since it pertains to the matters taken into account in internal agency decisions, is apparently not available from other sources. *See Franklin Nat'l Bank, supra*, 478 F.Supp. at 588; *Peck, supra*, 88 F.R.D. at 74; *United States v. Hooker Chemicals & Plastics Corp.*, 114 F.R.D. 100, 103 (W.D.N.Y.1987). Finally, the strong public interest in making sure that the statutory mandates are carried out weighs in favor of disclosure of the information to the A.G.

Ultimately, however, the issue will have to be analyzed document by document, based on the factors discussed above, assuming that any documents are found to be covered by the privilege in the first place. The RTC has not provided sufficient detail about the nature and content of the documents to allow the court to balance the

parties' interests in regard to each document. Again, *in camera* inspection will be appropriate only after the RTC has provided sufficiently detailed factual allegations concerning its assertion of the privilege.

### B. Attorney–Client Privilege

■ One who seeks to shield a document on the basis of the attorney-client privilege must show that:

(1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers, (c) for the purpose of securing primarily either (i) an opinion of law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

*Colton v. United States*, 306 F.2d 633, 637 (2d Cir.1962) (quoting *United States v. United Shoe Machinery Corp.*, 89 F.Supp. 357, 358–59 (D.Mass.1950)), *cert. denied*, 371 U.S. 951, 83 S.Ct. 505, 9 L.Ed.2d 499 (1963); *see, e.g., United States v. Schwimmer*, 892 F.2d 237, 243 (2d Cir.1989) (citations omitted); *First Chicago Int'l v. United Exchange Co.*, 125 F.R.D. 55, 56 (S.D.N.Y.1989) (Conner, J.); *Coastal Corp. v. Duncan*, 86 F.R.D. 514, 520 (D.Del. 1980).

■ While government agencies may, under appropriate circumstances, invoke the attorney-client privilege with respect to confidential communications to and from their in-house or outside counsel just as private parties may, they must bear the same burden of establishing all of the above-stated elements of the privilege. *See* Rule 501, F.R.Evid.; *Jordan v. United States Dep't of Justice*, 591 F.2d 753, 775 (D.C.Cir.1978); *Mobil Oil Corp. v. Dep't of Energy*, 102 F.R.D. 1, 9 (N.D.N.Y.1983); *Sterling Drug Inc. v. Harris*, 488 F.Supp.

1019, 1025 (S.D.N.Y.1980) (Stewart, J.); *cf. Schwimmer*, *supra*, 892 F.2d at 244 (citations omitted).

■ On the basis of the skeletal information provided in the index, it appears that the RTC has claimed the attorney-client privilege whenever an attorney was one of the persons who wrote or received the document. However, documents received by an attorney from his client, which would not be privileged if they remained in the client's hands, do not acquire protection merely because they were transferred to the attorney. *Fisher v. United States*, 425 U.S. 391, 403–04, 96 S.Ct. 1569, 1577–78, 48 L.Ed.2d 39 (1976); *Gould Inc. v. Mitsui Mining & Smelting Co.*, 825 F.2d 676, 679–80 (2d Cir.1987). Moreover, a document "does not come within the attorney-client privilege merely by being forwarded to or routed through the counsel's office." *Mobil Oil Corp.*, *supra*, 102 F.R.D. at 9–10.

With respect to most, if not all, of the documents for which the RTC claims the attorney-client privilege, it is impossible to discern whether they actually contain communications relating to the subject matter upon which an attorney's legal advice is sought, or merely contain discoverable information that happens to be addressed to or by counsel. Based upon this reasoning alone, the RTC must furnish more information to substantiate its claims of privilege.

■ While the RTC has labelled approximately one-fourth of these documents as "legal analysis," "legal opinion," "legal strategy," "legal recommendations," or "legal advice," *see, e.g.*, Index, items no. 7, 13, 33, 34, 37, 39, 41, 42, 43, 48, 49, 62, 68, 69, 70, 71, 73, 77, 82, 84, 85 & 88, the court cannot accept such paltry and self-serving descriptions. In addition, a few of these same documents, as well as others, are addressed to or by various unidentified or insufficiently identified people other than in-house or outside counsel. *See, e.g.*, Index, items no. 3, 12, 36, 58, 63, 84 & 88. Thus, it is abundantly clear that the RTC must furnish more details before the court can determine whether the RTC has established each of the elements of the attorney-client privilege—in particular, whether the

communications were made primarily for the purpose of securing legal assistance and without the presence of strangers—as to each of the documents that it has refused to disclose on the basis of that privilege.

### C. Work–Product Privilege

■ The work-product privilege is designed to "shelter[ ] the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case." *United States v. Nobles,* 422 U.S. 225, 238, 95 S.Ct. 2160, 2170, 45 L.Ed.2d 141 (1975). However, the work-product privilege "does not extend to every written document generated by an attorney; it does not shield from disclosure everything that a lawyer does. Its purpose is more narrow, its reach more modest." *Jordan, supra,* 591 F.2d at 775. Thus, the privilege includes "the selection and compilation of documents by counsel for litigation purposes ..., but its application depends on the existence of a real, rather than speculative, concern that the thought processes of ... counsel in relation to pending or anticipated litigation would be exposed." [3] *Gould, supra,* 825 F.2d at 680.

■ As an initial matter, the RTC's claims of work-product privilege are perplexing with respect to documents prepared long before the RTC even promulgated its policy statement, *see, e.g.,* Index, items no. 4, 5, 6, 9, 12 & 13, since such documents cannot be said to have been in anticipation of any specific litigation. Furthermore, the RTC's claims of work-product privilege suffer from all of the same deficiencies as those concerning its claims of the attorney-client privilege. The RTC must do far more to meet its burden of showing first that these documents were correctly identified as attorney work product.

■ Moreover, under the Federal Rules of Civil Procedure, even documents and tangible things that actually constitute at-

torney work product may be disclosed upon a showing of substantial need and inability to obtain the equivalent without undue hardship. Rule 26(b)(3), F.R.Civ.P.; *Upjohn Co. v. United States,* 449 U.S. 383, 400, 101 S.Ct. 677, 688, 66 L.Ed.2d 584 (1981). To date, the RTC has failed to provide the A.G. with even the minimum amount of information necessary to afford him a reasonable opportunity to show substantial need and undue hardship.

### III. *Deposition of David Cooke and Other RTC Officials*

■ The RTC contends that the A.G.'s request to depose David Cooke, the Executive Director of the RTC, and two other designated RTC officials, is improper, on the basis that the mental processes of agency heads are immune from discovery. The RTC cites *United States v. Morgan,* 313 U.S. 409, 421–22, 61 S.Ct. 999, 1004, 85 L.Ed. 1429 (1941), in support of its contention.

*Morgan,* however, does not stand for the broad proposition that the RTC advances. *Morgan* involved a challenge to an order of the Secretary of Agriculture regarding the maximum rates to be charged by market agencies at the Kansas City Stockyards. The Secretary's order was the result of adjudicatory agency proceedings involving notice to the affected parties and extensive hearings. The United States Supreme Court in *Morgan* upheld the district court's affirmance of the Secretary's order based on the extended personal testimony of the Secretary, and went on to state that

the Secretary should never have been subjected to this examination. The proceeding before the Secretary has a quality resembling that of a judicial proceeding. Such an examination of a judge would be destructive of judicial responsibility. We have explicitly held in this very litigation that it was not the function of the court to probe the mental processes of the Secretary. Just as a

---

**3.** Whether a document was prepared in "anticipation of litigation" depends upon such factors as proximity to the date of trial, the purpose for the document's preparation and whether the

document was prepared as a regular business practice. *Mobil Oil Corp., supra,* 102 F.R.D. at 11.

judge cannot be subjected to such a scrutiny, so the integrity of the administrative process must be equally respected. *Morgan, supra,* 313 U.S. at 422, 61 S.Ct. at 1004–05 (citations and internal quotation marks omitted). The Supreme Court's conclusion that the Secretary should not have been subjected to in-court examination thus clearly rests on the adjudicatory character of the agency proceeding. The *Morgan* dictum has also been extended to rulemaking proceedings under the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.* (the "APA"), *see Air Line Pilots Ass'n, Int'l v. Quesada,* 286 F.2d 319 (2d Cir.1961) (per curiam), *cert. denied,* 366 U.S. 962, 81 S.Ct. 1923, 6 L.Ed.2d 1254 (1961), and it applies to deposition testimony as well as in-court testimony. *See Warren Bank v. Camp,* 396 F.2d 52, 56–57 (6th Cir.1968).

██ By contrast, nonadjudicatory proceedings that do not involve rulemaking under the APA are subject to "thorough, probing, in-depth review." *See Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 414–15, 91 S.Ct. 814, 822–23, 28 L.Ed.2d 136 (1971); *County of Suffolk v. Secretary of Interior,* 562 F.2d 1368, 1383 (2d Cir.1977). Although review of an agency decisionmaker's mental process is "usually frowned upon," such a review may be conducted by the court to determine the reasons for the decisionmaker's choice—and, by extension, the factors taken into account by the decisionmaker—in the absence of "formal administrative findings." *Id.* at 1384.

In this case, the RTC policy statement only contains conclusory recitals that the RTC board of directors considered the statutorily mandated factors. The RTC conducted no formal adjudicatory hearings that would produce a record that this court could review, nor did it conduct rulemaking proceedings under the Administrative Procedure Act. Accordingly, the only practical way for the A.G. to examine the basis of the RTC's decision is through the examination of high-level RTC officials.

██ The RTC also cites *Wirtz v. Local 30, Int'l Union of Operating Eng'rs,* 34 F.R.D. 13 (S.D.N.Y.1963) (Wyatt, J.), for the proposition that the deposition of Cooke would be unduly burdensome. In *Wirtz,* which was a suit by the Secretary of Labor concerning the conduct of a union election, the union sought to depose the Secretary personally. The court stated that

common sense suggests that a member of the Cabinet and the administrative head of a large executive department should not be called upon personally to give testimony by deposition ... unless a clear showing is made that such a proceeding is essential to prevent prejudice or injustice to the party who would require it.

*Id.* at 14. Finding that the questions to be put to the Secretary could have been answered by a number of other officials at the Department of Labor, *id.* at 14, the court vacated the notice of deposition.

The circumstances of this case are vastly different from those of *Wirtz.* The Executive Director of the RTC is not the Secretary of Labor. Unlike the Department of Labor, which is a large, cabinet-level executive department with many functions, the RTC is a highly specialized agency which has been entrusted with the single task of managing insolvent savings and loan institutions. This case, which could affect the rights of thousands of tenants living in RTC-owned buildings in New York, involves a matter of great public concern arising out of the RTC's exercise of its function. Moreover, there is no indication that the information sought by the A.G. is available from any other source than the RTC officials designated by the A.G. Given the specialized function of the RTC and the need for the officials' testimony, the officials' busy schedule does not excuse them from attending the deposition any more it would if they were executives of a private corporation. The depositions are not unduly burdensome *per se,* and they will be allowed.

IV. *Conclusion*

In conclusion, the RTC must provide the A.G. with information, to the best of its ability, about all of the units in New York State that the RTC had taken over as of

February 22, 1991, when it issued its policy statement. The A.G. may depose the requested RTC officials. The RTC's claims of privilege are denied. However, in the interest of fairness to the RTC, the RTC will be allowed to make a new presentation reasserting the privileges, no later than July 17, 1991. Any responses from the opposing parties are due by July 24, 1991, and any reply from the RTC is due by July 29, 1991. The parties should try, sometime in late July, to reach agreement on a schedule for summary judgment motions and/or a trial.

IT IS SO ORDERED.