Lynn MARTIN, Secretary of the
United States Department of
Labor, Plaintiff,

v.

VALLEY NATIONAL BANK OF ARIZONA, Kroy, Inc., Kroy, Inc. Employee Stock Ownership Plan, Errol W. Bartine, James P. Fitzpatrick, John M. Glitsos, Randall E. Gnant, Kim D. Gustafson, David D. Kielty, Vittal G. Srimushnam, and David Gustafson, Defendants.

No. 89 Civ. 8361 (PKL).

United States District Court,
S.D. New York.

Dec. 23, 1991.

Suzanne Windle, Eric G. Serron, Trial Atty., U.S. Dept. of Labor, Office of the Sol., Plan Benefits Sec. Div., Washington, D.C., for plaintiff.

Arthur P. Greenfield, Snell & Wilmer, Phoenix, Ariz., Susan M. Campbell, Mudge, Rose, Guthrie, Alexander & Ferdon, New York City, for defendant Valley Nat. Bank.

Jeffrey Braucher, Treasurer, Kroy, Inc., Scottsdale, Ariz.

Michael Guinan, Bryan, Cave, McPheeters & McRoberts, Phoenix, Ariz.

Nora S. Hirschberger, Bryan, Cave, McPheeters & McRoberts, New York City, for defendant Errol Bartine.

John Glitsos, pro se.

Catherine Samuels, Schulte, Roth & Zabel, New York City, for Joe Simone.

Frank Wohl, Lankler, Siffert & Wohl, New York City, for non-party witnesses Patterson, Belknap, Webb & Tyler, Kevin Prendergast, Michael Segal, and William Sweetnam.

H. Michael Clyde, Leslie A. Kyman, Brown & Bain, Phoenix, Ariz., for Srimushnam & Fitzpatrick.

Randall E. Gnant, pro se.

David D. Kielty, pro se.

Joseph N. Hartzler, Rudnick & Wolfe, Chicago, Ill.

Andrew R. Sherwood, Levy, Sherwood, Klein & Dudley, P.A., Phoenix, Ariz., for David and Kim Gustafson.

Daniel J. Sullivan, Christy & Viener, New York City.

Charles Fournier, Mudge, Rose, Guthrie, Alexander & Ferdon, New York City, for third-party witness Webster & Sheffield.

MEMORANDUM AND ORDER

MICHAEL H. DOLINGER, United States Magistrate Judge:

The United States Secretary of Labor commenced this action under Title I of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C.A. §§ 1104(a)(1)(A) & (B), 1106(a)(1)(A), (B) & (D) (West 1985 & West Supp.1991), alleging that the Valley National Bank had violated its fiduciary obligations as trustee of the Kroy Inc. Employee Stock Ownership Plan (the "ESOP") by agreeing on behalf of the ESOP to its participation in a leveraged buyout of the plan sponsor, Kroy Inc. The Secretary's principal contentions are that defendants arranged for, or consented to, a transaction in which the ESOP paid more than adequate consideration for its shares in the purchased entity and that Valley failed to exercise independent judgment in assessing the proposal.

Valley and the other defendants contend that the ESOP did receive adequate consideration. Moreover, they assert that the Secretary should be estopped from pursuing her claim by virtue of her alleged failure to advise Valley and the other participants, at the time of the consummation of the transaction, that she had serious reservations about the adequacy of the terms. Defendants have also asserted a series of counterclaims alleging that their due process rights have been violated by both the Secretary's failure to promulgate regulations reflecting her interpretation of the "adequate consideration" requirement of 29 U.S.C.A. § 1002(18) (West Supp.1991), and the allegedly misleading comments made by a Department employee to counsel for the ESOP suggesting that the Department had no problems with the transaction. Defendants also claim that the Department's decision to challenge the Kroy transaction was undertaken pursuant to "secret" agency law that was promulgated

*de facto,* and hence in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706 (1988).

At present, the court faces a host of discovery motions by the Secretary. The first set of motions seek protective orders (1) upholding the Secretary's refusal to produce, in whole or in part, twenty-three documents on the basis of irrelevance or privilege, (2) vacating notices of deposition for three officials of the Department who are described as highly placed policy makers, and (3) precluding inquiry by Valley in future depositions into a number of subject-matter areas listed in defendants' Rule 30(b)(6) notice. The Secretary's second set of motions seek to compel production of documents held (1) by the former law firm Webster & Sheffield,[1] which was counsel to the ESOP, and (2) by Valley's counsel, the firm of Snell & Wilmer.

I turn first to the motions for protective orders and then address the two motions to compel.

### A. *The Secretary's Motion to Limit Document Discovery*

As noted, plaintiff seeks to withhold twenty-three documents in whole or part on grounds of irrelevancy, privilege or work-product immunity.[2] I first address relevance and then the remaining objections.

### 1. *Relevance*

■ The standard of relevance for the purpose of discovery is broadly defined to encompass any information that "appears reasonably calculated to lead to the discovery of admissible evidence." *See, e.g., Daval Steel Prods. v. M/V Fakredine,* 951 F.2d 1357, 1367 (2d Cir.1991); *New York v. Yonkers Contracting Co.,* 90 Civ. 3779, 1991 WL 167981, *2 (S.D.N.Y. August 16, 1991); *Mary Imogene Bassett Hosp. v. Sullivan,* 136 F.R.D. 42, 48–49 (N.D.N.Y. 1991); *Herbert v. Lando,* 73 F.R.D. 387,

394–95 (S.D.N.Y.1977) *rev'd on other gds.,* 568 F.2d 974 (2d Cir.1977), *rev'd on other gds.,* 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979); 4 James Wm. Moore & Jo Desha Lucas, *Moore's Federal Practice* ¶ 26.-56[1] at 26–94 to 96 & n. 4 (2d ed. 1991) (citing cases). Such relevance must be determined in light of the claims and defenses asserted by the parties. *See Planned Parenthood Fed'n v. Heckler,* 101 F.R.D. 342, 344 (D.D.C.1984) (citing *Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 351, 98 S.Ct. 2380, 2389, 57 L.Ed.2d 253 (1978)); *United States v. IBM Corp.,* 66 F.R.D. 180, 182 (S.D.N.Y.1974); 4 *Moore's Federal Practice, supra,* ¶ 26.51[1] at 26–97 to 98.

■ In this case, the documents withheld by plaintiff fit into three broad categories—documents relating to the Kroy transaction, documents relating to other similar transactions, and documents concerning the possible preparation and issuance of guidelines to govern the assessment of these types of transactions. In generic terms, each of these categories is relevant to the defenses and counterclaims asserted by defendants.

Defendants invoke estoppel as one defense, premised upon their apparent contention that Labor Department officials deliberately misled them into believing that the Secretary had no objection to the contemplated leveraged buyout, and hence lulled them into agreeing to the proposed terms on behalf of the ESOP. Although plaintiff appears to suggest that no such defense can be asserted against the Government (*see* Pltff's Consolidated Reply at 17–18), estoppel may be available when "the traditional elements of estoppel" are present and there has been "affirmative misconduct" by Government representatives. *See, e.g., Azizi v. Thornburgh,* 908 F.2d 1130, 1136 (2d Cir.1990) (citing *Scime v. Bowen,* 822 F.2d 7, 9 n. 2 (2d Cir.1987); *Corniel–Rodriguez v. INS,* 532 F.2d 301, 306–07 (2d Cir.1976)); *Howard Bank v.*

---

**1.** Webster & Sheffield began its dissolution process in the Spring of 1991. (*See* Affidavit of Charles W. Fournier, Esq., sworn to August 12, 1991, at ¶ 10.)

**2.** Defendants originally sought production of 24 documents, but subsequently withdrew their request for document number 9.

*United States,* 759 F.Supp. 1073, 1080 (D.Vt.1991); *United States v. Schmitt,* 734 F.Supp. 1035, 1055 (E.D.N.Y.1990). In any event, the defense has not been stricken by the court, and hence defendants are still entitled to discovery relevant to it.

As for the scope of materials relevant to sustain the estoppel defense, defendants would have to establish (1) what the Labor Department told them, (2) the falsity of the information, and (3) the circumstances that demonstrate that these false communications amounted to affirmative misconduct. So defined, defendants' estoppel defense could encompass any materials that would reflect what was communicated to Valley or its representatives, any instructions or discussions within the Labor Department concerning what the Department's representative should communicate, any evidence of the Department's then contemporaneous views about the fairness of the proposed transaction, any evidence about the Department's policies concerning pre-closing clearances for these types of transaction, and any evidence concerning possible motivation for the Department to misrepresent its assessment of the Kroy transaction. These categories of potential inquiry suggest that any documents relating to the Department's evaluation of the Kroy transaction and of similar type transactions would be potentially relevant, as would be any documents reflecting formulations of policy about pre-closing procedures.

In addition, defendants assert a series of counterclaims premised on the notion that the Secretary has evolved a body of secret law governing the meaning of the "adequate consideration" requirement, and has applied it to defendants' detriment, in violation of both the APA and due process. *See, e.g., City of New York v. Heckler,* 578 F.Supp. 1109, 1118 (E.D.N.Y.), *aff'd,* 742 F.2d 729 (2d Cir.1984), *reh'g denied,* 755 F.2d 31 (2d Cir.1985), *aff'd,* 476 U.S. 467, 106 S.Ct. 2022, 90 L.Ed.2d 462 (1986). Again, whatever the legal or factual robustness of these claims, they have not been dismissed, and they define a field of relevant inquiry that would potentially include any evidence of the Department's evolution of standards to assess these types of transactions, any documentation of the process by which the Department evolved possible guidelines, and evidence as to why such guidelines were not published.

Finally, I note one additional possible basis of relevance for those documents reflecting the attempted development of a standard for applying the "adequate consideration" requirement. Although the Secretary argues that these documents are irrelevant to the purely legal issue of the meaning and application of that statutory term (*see* Pltff's Consolidated Reply at 9) (citing *Marx & Co. v. Diners' Club, Inc.,* 550 F.2d 505, 508–16 (2d Cir.), *cert. denied,* 434 U.S. 861, 98 S.Ct. 188, 54 L.Ed.2d 134 (1977)), they may acquire relevance if the Secretary ultimately takes the position that the court should defer to her interpretation of the term. *See, e.g., Connecticut Dep't of Income Maintenance v. Heckler,* 471 U.S. 524, 532, 105 S.Ct. 2210, 2214, 85 L.Ed.2d 577 (1985); *Chevron U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 842–44, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984). In such a case, an examination of the basis for the Secretary's interpretation, including the evolution of the Department's views and the consistency of their application, might be permissible subjects of inquiry. *See Olsen v. Egger,* 594 F.Supp. 644, 648 n. 6 (S.D.N.Y.1984) (citing *Board of Educ. v. Harris,* 622 F.2d 599, 613 (2d Cir.1979), *cert. denied,* 449 U.S. 1124, 101 S.Ct. 940, 67 L.Ed.2d 110 (1981)). *Cf. EEOC v. Arabian American Oil Co.,* —— U.S. ——, 111 S.Ct. 1227, 1235, 113 L.Ed.2d 274 (1991) (level of deference to be afforded EEOC interpretation depends upon, *inter alia,* "consistency with earlier and later pronouncements").

In sum, I conclude that each of the categories at issue comes within the broad ambit of relevance under Rule 26(b)(1).

### 2. *The Secretary's Claims of Privilege and Invocation of the Work–Product Rule*

With respect to each of the twenty-three documents at issue, plaintiff invokes a predecisional deliberative privilege. She also

claims that fifteen of the documents should be protected by the work-product rule, and nine by the attorney-client privilege.[3] Before dealing with the documents, I briefly address the general standards that we are to apply in assessing this controversy.

### a. Burden of Proof

■ At the outset it bears emphasis "that the burden is on a party claiming the protection of a privilege to establish those facts that are the essential elements of the privileged relationship." *von Bulow v. von Bulow*, 811 F.2d 136, 144 (2d Cir.), *cert. denied*, 481 U.S. 1015, 107 S.Ct. 1891, 95 L.Ed.2d 498 (1987); *In re Grand Jury Subpoena Dated Jan. 4, 1984*, 750 F.2d 223, 224–25 (2d Cir.1984). *Accord, e.g., United States v. Stern*, 511 F.2d 1364, 1367 (2d Cir.), *cert. denied*, 423 U.S. 829, 96 S.Ct. 47, 46 L.Ed.2d 46 (1975). More broadly, the proponent of the privilege must establish not merely the privileged relationship, but all essential elements of the privilege. *See, e.g., In re Horowitz*, 482 F.2d 72, 82 (2d Cir.), *cert. denied*, 414 U.S. 867, 94 S.Ct. 64, 38 L.Ed.2d 86 (1973); *United States v. Kovel*, 296 F.2d 918, 923 (2d Cir.1961). This burden requires an evidentiary showing by competent evidence, *see, e.g., von Bulow v. von Bulow*, 811 F.2d at 144, and cannot be " 'discharged by mere conclusory or ipse dixit assertions.' " *von Bulow v. von Bulow*, 811 F.2d at 146 (quoting *In re Bonanno*, 344 F.2d 830, 833 (2d Cir.1965)); *In re Grand Jury Subpoena Dated Jan. 4, 1984*, 750 F.2d at 224–25.

### b. The Predecisional Deliberative Privilege

The principal basis on which plaintiff seeks to withhold the documents is the so-called deliberative privilege, which has been referred to in various contexts as a public information privilege, an executive privilege, or a predecisional deliberative privilege. As encapsulated in Supreme Court Standard 509, "[t]he government has a privilege to refuse to give evidence … upon a showing of reasonable likelihood of danger that the evidence will disclose … official information" (Sup.Ct.Stan. 509(b)), which includes "intragovernmental opinions or recommendations submitted for consideration in the performance of decisional or policymaking functions." (Sup. Ct.Stan. 509(a)(2)(A) (*quoted in* 2 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Evidence* at 509–1 (1990).)[4]

This principle finds its genesis in federal statute, *see* Note, *Discovery of Government Documents and the Official Information Privilege*, 76 Colum.L.Rev. 142, 145–56 (1976), but has since become the subject of a broader federal common law. *See generally id.* at 156–57 (*citing Kaiser Aluminum & Chem. Corp. v. United States*, 157 F.Supp. 939, 141 Ct.Cl. 38 (1958)).[5] The privilege is grounded on the notion "that communications to the government and communications within the government will be stifled unless confidentiality is assured." 2 *Weinstein's Evidence, supra*, ¶ 509[05] at 509–34 to 35. This concerns flows from

> [t]he assumption … that "government, no less than the citizen, needs open but protected channels for the kind of plain talk that is essential to the quality of its functioning." Without frank, confidential discussion between subordinates and their superiors, "crucial decisions may be made with insufficient knowledge or inadequate advice."

*In re Franklin Nat'l Bank Sec. Litig.*, 478 F.Supp. 577, 581 (E.D.N.Y.1979) (citations omitted) (quoting *Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena*, 40 F.R.D. 318, 325

---

**3.** Defendants have, however, withdrawn their request for one document for which plaintiff had claimed protection.

**4.** The Federal Standards of Evidence embody pre-existing case law and are looked to as reliable guides notwithstanding the decision of Congress not to include them in the Federal Rules of Evidence. *See, e.g., Burke v. New York City Police Dep't*, 115 F.R.D. 220, 230 n. 6 (S.D.N.Y.1987); *In re Franklin Nat'l Bank Sec.*

*Litigation*, 478 F.Supp. 577, 580 (E.D.N.Y.1979); *United States v. Fatico*, 441 F.Supp. 1285, 1298 (E.D.N.Y.1977), *rev'd on other gds.*, 579 F.2d 707 (2d Cir.1978).

**5.** In this action plaintiff asserts only federal claims. Under these circumstances, Fed.R.Evid. 501 requires the application of federal law to questions of privilege.

(D.D.C.1966), *aff'd on opinion below*, 384 F.2d 979 (D.C.Cir.), *cert. denied*, 389 U.S. 952, 88 S.Ct. 334, 19 L.Ed.2d 361 (1967), and Note, *Discovery of Government Documents*, 76 Colum.L.Rev. at 143). *See also EPA v. Mink*, 410 U.S. 73, 87, 93 S.Ct. 827, 836, 35 L.Ed.2d 119 (1973); *Hopkins v. United States Dep't of Hous. & Urban Dev.*, 929 F.2d 81, 84 (2d Cir.1991).

To demonstrate the applicability of the privilege, the Secretary must meet two requirements.

First, the document must be "predecisional," that is, "prepared in order to assist an agency decisionmaker in arriving at his decision." *Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*, 421 U.S. 168, 184 [95 S.Ct. 1491, 1500, 44 L.Ed.2d 57] (1975). Second, the documents must be "deliberative," that is, "actually ... related to the process by which policies are formulated." *Jordan v. United States Dep't of Justice*, 591 F.2d 753, 774 (D.C.Cir.1978) (en banc).

*Hopkins v. United States Dep't of Hous. & Urban Dev.*, 929 F.2d at 84. *Accord, e.g., Resolution Trust Corp. v. Diamond*, 137 F.R.D. 634, 640 (S.D.N.Y.1991); *Mobil Oil Corp. v. Dep't of Energy*, 102 F.R.D. 1, 5 (N.D.N.Y.1983).

■ Consistent with this definition, the privilege does not apply to "purely factual material" that may be severed from the rest of the document. *Hopkins v. United States Dep't of Hous. & Urban Dev.*, 929 F.2d at 85; *Local 3, Int'l Bhd. of Elec. Workers v. NLRB*, 845 F.2d 1177, 1180 (2d Cir.1988). It also does not apply to "explanations or interpretations of an existing decision." *Mobil Oil Corp. v. Dep't of Energy*, 102 F.R.D. at 5. *See, e.g., NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 151–52 & n. 19, 95 S.Ct. 1504, 1516–17 & n. 19, 44 L.Ed.2d 29 (1975); *Resolution Trust Corp. v. Diamond*, 137 F.R.D. at 641; *J.R. Norton Co. v. Arizmendi*, 108 F.R.D. 647, 648–49 (S.D.Cal.1985); *Resident Advisory Bd. v. Rizzo*, 97 F.R.D. 749, 753 (E.D.Pa. 1983); *In re Agent Orange Prod. Liab.*

*Litig.*, 97 F.R.D. 427, 434–35 (E.D.N.Y. 1983). *See also Lead Industries Ass'n v. OSHA*, 610 F.2d 70, 82–84 (2d Cir.1979); *In re Franklin Nat'l Bank Sec. Litig.*, 478 F.Supp. at 581–82 (citing cases).[6] Similarly, it does not apply to recommendations that the agency "chooses *expressly* to adopt or incorporate by reference" in its ultimate decision. *NLRB v. Sears, Roebuck & Co.*, 421 U.S. at 161, 95 S.Ct. at 1521 (emphasis in original).

■ The privilege is not absolute. Thus, even if the proponent of the privilege makes the requisite showing, the court is nonetheless required to determine whether it should be overridden. *See, e.g., Zinker v. Doty*, 637 F.Supp. 138, 141 (D.Conn. 1986); *Skibo v. City of New York*, 109 F.R.D. 58, 61 (E.D.N.Y.1985); *In re Agent Orange Prod. Liab. Litig.*, 97 F.R.D. at 434; *In re Franklin Nat'l Bank Sec. Litig.*, 478 F.Supp. at 582–83. Among the pertinent considerations that may counterbalance the government's interest in confidentiality are the needs of the adversary litigant for the information, the societal interest in "accurate judicial fact finding," and, in some cases, the public interest "in opening for scrutiny the government's decision making process." *Id.* at 582. The most commonly cited factors to be considered in this balancing process are found in Judge Weinstein's summary in *In re Franklin Nat'l Bank Securities Litigation*:

(i) the relevance of the evidence sought to be protected; (ii) the availability of other evidence; (iii) the "seriousness" of the litigation and the issues involved; (iv) the role of the government in the litigation; and (v) the possibility of future timidity by government employees who will be forced to recognize that their secrets are violable.

478 F.Supp. at 583 (citations omitted). *Accord, e.g., United States ex rel. Irvin Indus., Inc. v. Goodyear Aerospace Corp.*, 87 Civ. 4444, 1991 WL 156388, *4 (S.D.N.Y.

---

**6.** We recognize, of course, that the distinction between factual and analytical or opinion material may be elusive. *See, e.g., Lead Industries Ass'n v. OSHA*, 610 F.2d at 82–83; *King v.*

*Conde*, 121 F.R.D. 180, 193 (E.D.N.Y.1988); *In re Franklin Nat'l Bank Sec. Litig.*, 478 F.Supp. at 581–82.

Aug. 2, 1991); *Mobil Oil Corp. v. Dep't of Energy,* 102 F.R.D. at 5.

#### c. *The Work–Product Rule*

Plaintiff argues alternatively that a majority of the withheld documents constitute work product. Rule 26(b)(3) defines a qualified immunity from discovery for documents "prepared in anticipation of litigation or for trial."

■ As a general matter, the work-product rule applies only to documents prepared principally or exclusively to assist in anticipated or ongoing litigation. *See, e.g., Binks Mfg. Co. v. National Presto Indus., Inc.,* 709 F.2d 1109, 1118–19 (7th Cir.1983); *In re Grand Jury Investigation,* 599 F.2d 1224, 1229 (3d Cir.1979) (quoting 8 Charles A. Wright & Arthur Miller, *Federal Practice and Procedure: Civil* § 2024 at 198 (1970)); *Leonen v. Johns–Manville,* 135 F.R.D. 94, 96–97 (D.N.J.1990); *Hardy v. New York News, Inc.,* 114 F.R.D. 633, 644 (S.D.N.Y.1987); *Status Time Corp. v. Sharp Elec. Corp.,* 95 F.R.D. 27, 29 (S.D.N.Y.1982); *Janicker v. George Washington Univ.,* 94 F.R.D. 648, 650 (D.D.C. 1982); *Carver v. Allstate Ins. Co.,* 94 F.R.D. 131, 134 (S.D.Ga.1982). It follows, then, that if a party prepares a document in the ordinary course of its business, it will not be protected even if the party is aware that the document may also be useful in the event of litigation. *See, e.g., Binks Mfg. Co. v. National Presto Indus., Inc.,* 709 F.2d at 1119; *Hardy v. New York News Inc.,* 114 F.R.D. at 644; *Joyner v. Continental Ins. Companies,* 101 F.R.D. 414, 415–16 (S.D.Ga.1983); *Janicker v. George Washington Univ.,* 94 F.R.D. at 650; *Atlanta Coca–Cola Bottling Co. v. Transamerica Ins. Co.,* 61 F.R.D. 115, 118 (N.D.Ga.1972).

Even if the party opposing discovery demonstrates that the document constitutes work product, the document may nonetheless be discoverable if the discovering party establishes a sufficiently acute need for it. Rule 26(b)(3) permits an invasion of work-product immunity "upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means." Fed.R.Civ.P. 26(b)(3). *See also Horn & Hardart Co. v. Pillsbury Co.,* 888 F.2d 8, 12 (2d Cir.1989). Even if such disclosure is required, however, Rule 26 directs the court to "protect against disclosure of the mental impressions, conclusions, opinions or legal theories of an attorney or other representative of a party concerning the litigation." Fed. R.Civ.P. 26(b)(3). *See also Upjohn Co. v. United States,* 449 U.S. 383, 399–402, 101 S.Ct. 677, 687–689, 66 L.Ed.2d 584 (1981); *In re John Doe Corp.,* 675 F.2d 482, 492–93 (2d Cir.1982).

#### d. *The Attorney–Client Privilege*

Plaintiff's remaining objection to the production of certain of the documents is its assertion of the attorney-client privilege. The most commonly cited formulation of the privilege in this circuit originates with Wigmore:

> (1) where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived.

8 John Henry Wigmore, *Evidence,* § 2292 (McNauton rev. 1961), *quoted in In re Grand Jury Subpoena Duces Tecum Dated September 15, 1983,* 731 F.2d 1032, 1036 (2d Cir.1984); *United States v. Bein,* 728 F.2d 107, 112 (2d Cir.), *cert. denied,* 469 U.S. 837, 105 S.Ct. 135, 83 L.Ed.2d 75 (1984). On its face, this standard applies only to communications by the client to the attorney, but the courts appear to concur that the protection should also extend to legal advice rendered by the attorney, at least if it might reflect or reveal the client's confidential communications. *See, e.g., Schlefer v. United States,* 702 F.2d 233, 245 (D.C.Cir.1983); *United States v. Amerada Hess Corp.,* 619 F.2d 980, 986 (3d Cir.1980) (citing cases); *P. & B. Marina, Ltd. Partnership v. Logrande,* 136 F.R.D.

50, 53 (E.D.N.Y.1991); *O'Brien v. Board of Educ.*, 86 F.R.D. 548, 549 (S.D.N.Y.1980). *See also Upjohn Co. v. United States*, 449 U.S. 383, 390, 101 S.Ct. 677, 683, 66 L.Ed.2d 584 (1981) (dictum); *In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d at 1036–37; 2 *Weinstein's Evidence, supra*, ¶ 503(b)[03] at 503–39 & n. 5.

### 3. *Evaluation of Plaintiff's Privilege Claims*

Bearing in mind the foregoing standards, I briefly address each of the twenty-three documents that the Secretary seeks to withhold, in whole or in part, from production.

■ (a) Document 1 involves an evaluation of the fairness of a leveraged buyout of a company other than Kroy. Plaintiff has produced those segments of the documents that are purely factual, but has withheld evaluative portions of the memorandum, citing both the deliberative privilege and the work-product rule.

The portions withheld are plainly evaluative in nature. Moreover, from the context in which this analysis is offered, it is apparent that the evaluation was intended to assist the decisionmaker. Accordingly, the redacted segments of the documents come within the scope of the predecisional deliberative privilege.

Defendants have not made an adequate case for overcoming the privilege, at least at this stage of the litigation. The manner in which the Department dealt with other ESOP-involved leverage buyouts may be relevant to defendants' estoppel defense and to their claims that plaintiff has failed to comply with the requirements of the APA and of due process, but the evidence necessary to an evaluation of those claims and defenses is being provided. The preliminary evaluations of the adequacy of buyouts other than that of Kroy are simply

not necessary to enable defendants to press their legal position in this case.[7]

(b) Document 2 is a standard form that is apparently filled out when the Department opens an investigation. It has been produced with the exception of brief snippets that refer to the reasons for opening an investigation of a leveraged buyout other than that of Kroy. To protect this material, plaintiff invokes the deliberative privilege and the work-product rule. Neither is applicable.

■ As noted, the segments in question are part of a standard form, and simply note the purpose of the investigation. Even if the form itself is part of the deliberative process, these segments do not reflect any recommendations or analyses. Accordingly, the deliberative privilege is inapplicable.

■ As for the work-product rule, plaintiff has failed to demonstrate that the withheld segments, or indeed the entire document, come within the scope of the rule. There is simply no evidence that this document was created principally to assist in anticipated litigation. If anything, the document appears to be simply a form utilized to open an investigation, and is thus presumably filled out for record-keeping purposes. In the absence of any evidence of its utilization in litigation, plaintiff's claim cannot be sustained.

(c) Document 3 is an internal Department memorandum prepared by Counsel for General Litigation in the Plan Benefits Security Division and sent to the Solicitor of the Department. It concerns the Department's responses to another leveraged buyout. The plaintiff seeks to withhold the document in its entirety, asserting the attorney-client privilege, the work product rule, and the deliberative privilege.

■ Although plaintiff offers no evidence directly supporting its claim of an attorney-client privilege,[8] it is apparent

---

**7.** Because the deliberative privilege suffices to justify withholding the redacted portions of document 1, I do not address the work-product question.

**8.** Indeed, its only evidentiary submission is a document entitled "Invocation of Privilege," in which plaintiff's affiant, David G. Ball, summarizes the general nature of the documents, and in brief, conclusory terms suggests that they are all deliberative. Mr. Ball is the Assistant Secre-

from the face of the document that the privilege does apply. The Department, through its Office of Pension and Welfare Benefits Programs ("OPWBP"), requested legal advice from counsel, and the memorandum sets out the substance of that advice. Although the memorandum is directed to the Solicitor rather than to the OPWBP, this is of no consequence since the privilege encompasses communications between attorneys that are designed to facilitate the rendition of legal advice to the client. *See Parkway Gallery Furniture, Inc. v. Kittinger/Pennsylvania House Group, Inc.,* 116 F.R.D. 46, 49 (M.D.N.C. 1987); Sup.Ct.Stan. 503(b)(5); 2 *Weinstein's Evidence, supra,* at 503–6, 503–14. *See also In re Federal Grand Jury Proceedings, 89–10 (MIA),* 938 F.2d 1578, 1579–83 (11th Cir.1991), *P. & B. Marina, Ltd. Partnership v. Logrande,* 136 F.R.D. at 53.

■ Unlike the deliberative privilege or the work-product rule, the attorney-client privilege in its federally recognized form cannot be overcome simply by a showing of need. *See, e.g., Upjohn Co. v. United States,* 449 U.S. at 396, 101 S.Ct. at 686. Accordingly, document 3 is protected from disclosure irrespective of whether the deliberative privilege or work-product rule would also apply.

(d) Document 4 is an internal memorandum from the Acting Administrator of the OPWBP to the Secretary, and concerns a leveraged buyout other than the transaction involving Kroy. Plaintiff invokes the deliberative privilege and work-product rule for the entire document.

■ Document 4 is not within the scope of the deliberative privilege. For the most part, the memorandum simply reports decisions already taken and the reasons for them, and that discussion is not encompassed in the privilege. *See, e.g., Resolution Trust Corp. v. Diamond,* 137 F.R.D. at 641 (citing *NLRB v. Sears, Roebuck & Co.,* 421 U.S. at 152 & n. 19, 95 S.Ct. at

1517 & n. 19; *Mobil Oil Corp. v. Dep't of Energy,* 102 F.R.D. at 5)). Although the document also contains a reference to possible future action, that discussion is not intended to assist a decisionmaker in making a policy decision. Quite to the contrary, the author of the memorandum notes that the Solicitor's office was preparing a separate litigation analysis, which would presumably serve as part of the decision-making process. In contrast, the author notes in the concluding sentence of this memorandum that "[t]he purpose of this memorandum is to inform you of the action we are taking so that you may be aware of the matter in the event widespread publicity is generated." In short, this document was explicitly not "prepared in order to assist an agency decisionmaker in arriving at his decision." *Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.,* 421 U.S. at 184, 95 S.Ct. at 1500; *Hopkins v. United States Dep't of Hous. & Urban Dev.,* 929 F.2d at 84.

■ For similar reasons the document does not come within the work-product rule. Although litigation concerning the matter under discussion was sufficiently foreseeable at the time that the memorandum was drafted, plaintiff has failed to make any showing that the memorandum itself was prepared to assist in such contemplated litigation. Assistant Secretary Ball[9] is entirely silent on this matter, and, as noted, the memorandum itself makes plain that its purpose was simply to alert the Secretary to the possibility that publicity would be engendered by the Department's investigation of the transaction.

(e) Document 5 is the same standard form as Document 2, although it concerns a different leveraged buyout. Again, plaintiff invokes the deliberative privilege and work-product rule to protect a small portion of this standard form. For the same reasons as noted with respect to Document 2, the deleted sentences have not been shown by plaintiff to be intended to assist a decisionmaker to reach a decision

tary for Pension and Welfare Benefits of the Pension and Welfare Benefits Administration.

9. As noted, Mr. Ball is the Assistant Secretary for Pension and Welfare Benefits of the Pension and Welfare Benefits Administration.

on any matter of policy, and plaintiff has equally failed to demonstrate that the document or the deleted portion of it was prepared to assist in contemplated litigation.

(f) Document 6 is a memorandum from a Department investigator to the Chief of the Division of Investigation. It refers to a private lawsuit concerning a leveraged buyout, and makes a recommendation, which has been deleted from the copy produced to defendants. Plaintiff asserts both the deliberative privilege and the work-product rule.

Plaintiff fails to establish that the recommendation was made in anticipation of litigation by the Department. Indeed, the record is silent as to this matter. The recommendation does constitute deliberative material and would come within the privilege unless it was expressly adopted by the decisionmaker. The record does not directly address that question, although it may fairly be inferred that the recommendation was adopted. In any event, plaintiff bears the burden of establishing the applicability of the privilege, and since she has not met her burden, her claim cannot be sustained.

(g) Document 7 is a detailed memorandum from the Acting Associate Solicitor to the Deputy Assistant Secretary of the Pension and Welfare Benefits Administration. Plaintiff has withheld the document in its entirety based on claims of deliberative privilege and attorney-client privilege.

Although plaintiff does not offer direct evidence to support its invocation of the attorney-client privilege, the document itself explicitly reflects that it constitutes legal advice rendered by the attorney at the request of his client. Accordingly it is protected from disclosure, and we need not address the other privilege claim.

(h) Document 8 is a draft of an internal memorandum to be sent by the Assistant Secretary for the Pension and Welfare Benefits Administration to the Secretary concerning "Leveraged Buyouts Involving ESOPs." Plaintiff has withheld the document on the basis of the deliberative privilege. The record and the document itself adequately support the claim of privilege.

Although the privilege can be overcome by an adequate showing of need, defendants have not made such a showing in connection with this draft memorandum. Accordingly, it need not be produced.

(i) Document 10 [10] is a memorandum from the Department's counsel to the Associate Director of Enforcement of the Pension and Welfare Benefits Administrator concerning the Kroy leveraged buyout. Plaintiff has withheld this document in its entirety, asserting the deliberative and attorney-client privileges, as well as the work-product rule.

The memorandum reflects legal analysis and advice by counsel to the Department. It is therefore within the parameters of the attorney-client privilege and need not be produced. Accordingly, I do not address the alternative grounds invoked by the Secretary.

(j) Document 11 is a memorandum from the Chief of the Division of Investigations to the Associate Director for Enforcement. It concerns certain aspects of the Kroy leveraged buyout, and plaintiff is withholding those portions labelled "Analysis" and "Recommendation" based on her invocation of the deliberative privilege and the work-product rule.

The withheld portions of document 11 do not come within the deliberative privilege. The section labelled "Recommendation" contains a suggestion that was explicitly adopted by the Department. (*See* Documents 12, 15, 19.) The section labelled "Analysis" contains the same recommendation and the basis for that recommendation. The analysis, however, is repeated in numerous public documents, including the complaint in this action, thus reflecting the decisionmaker's adoption of it. Accordingly, no portion of document 11 qualifies for the deliberative privilege.

---

**10.** Defendants have withdrawn their request for document 9.

■ As for the work-product rule, plaintiff has not established that this document was prepared principally to assist in anticipated litigation. If anything was anticipated at the time—the document is dated November 13, 1986—it was the opening of an inquiry into the Kroy buyout. Although the Department appears to take the position that such inquiries and the documents generated by them automatically qualify as work product, that is not the case. The ordinary business of the Division of Investigations is presumably to review proposed or completed transactions for compliance with ERISA and other applicable law. The fact that the Division chooses to conduct such a review does not constitute contemplation of litigation, although it is of course possible that some inquiries may ultimately lead to litigation.

■ The most telling analogy is to the oft-litigated question of when an insurance company's investigation of a claim will be viewed as activity in contemplation of litigation. Insurance companies have frequently argued that all documents generated by them in the course of an investigation should be deemed work product since many claims are rejected and significant numbers of those rejected claims reappear in the guise of lawsuits. The courts have consistently rejected this contention. Many have insisted on proof of "objective facts establishing an identifiable resolve to litigate prior to the investigative efforts resulting in the report before the work product doctrine becomes applicable." *Janicker v. George Washington Univ.*, 94 F.R.D. at 650 (citing *Fine v. Bellefonte Underwriters Ins. Co.*, 91 F.R.D. 420 (S.D.N.Y.1981); *Atlanta Coca–Cola Bottling Co. v. Transamerica Ins. Co.*, 61 F.R.D. 115 (N.D.Ga.1972)). At the very least, the proponent of the work-product rule must show that "some articulable claim, likely to lead to litigation, [has] arisen." *Binks Mfg. Co. v. National Presto Indus., Inc.*, 709 F.2d at 1119 (quoting *Coastal States Gas Corp. v. Department of Energy*, 617 F.2d 854, 865 (D.C.Cir. 1980)).

■ This standard precludes routine application of the work-product rule to all Department investigatory documents. Indeed, until such time as an investigation yields evidence that makes it apparent that there is a litigable claim, the work-product rule does not apply. Moreover, even if the Department unearths information reflecting a likely violation of relevant statutory standards, this does not mean that all documents henceforth generated are necessarily work product. At a minimum, the Department must demonstrate that the discovery of such violations made litigation likely, and that the document in question was prepared principally to assist in such litigation. *See, e.g., Binks Mfg. Co. v. National Presto Indus. Inc.*, 709 F.2d at 1118–19; *Hardy v. New York News, Inc.*, 114 F.R.D. at 644.

In the case of Document 11, the plaintiff has entirely failed to make the necessary showing. The document appears to have been prepared prior to the opening of a formal investigation. There is no evidence that the Department had already concluded that the transaction in question—as then structured—constituted a violation of law and there was no reason to assume at the time that litigation was likely, since the Department had apparently not reached any definitive conclusions and since the transaction had not yet even closed. Furthermore, the Department has made no showing that the document itself was prepared principally to assist in any litigation that may have been contemplated at the time.

In sum, the redacted sections of Document 11 must be produced.

(k) Document 12 is another standard form reflecting the opening of an investigation, in this case concerning the Kroy leveraged buyout. The only deleted section is a sentence noting the purpose of the investigation. For the reasons already noted with respect to Documents 2 and 5, this segment is not protected from disclosure.

(*l*) Document 13 is an internal memorandum from the Chief of the Division of Investigations to the Associate Director for Enforcement concerning the Kroy buyout.

Plaintiff has deleted portions of the document on the basis of the deliberative privilege and the work-product rule.

The deleted portions of the document reflect an analysis of possible problems with the Kroy transaction and make a specific recommendation. The recommendation was in fact adopted (*see, e.g.,* Documents 15, 19), and accordingly the segment labelled "Recommendation" is not protected by the deliberative privilege.

■ The balance of the withheld portions constitute analysis of some of the issues raised by the Kroy transaction, and were obviously intended as background to assist the decision-maker in acting on the recommendation. Since the decision-maker did not explicitly adopt these analyses when accepting the recommendation, they qualify for inclusion within the protective scope of the deliberative privilege.

■ As for the work-product rule, this document presents a closer question than Document 11. By this stage, the transaction had closed, and it appears that the Department had determined that one or more violations had occurred. Nonetheless, it is unclear whether litigation was "likely" at that stage and whether the primary purpose of the document was to assist in such contemplated litigation. In this regard, it bears emphasis that plaintiff's evidentiary presentation is entirely silent on these questions. That being the case, plaintiff has necessarily failed to meet her burden of proof on the matter.

■ Defendants seek disclosure of the deleted portions of the document, arguing that even if covered by a privilege, they still have a pressing need for those materials. In resolving this question, we must weigh the claimed harm of disclosure against the claimed harm of non-disclosure. *See, e.g., In re Franklin Nat'l Bank Sec. Litig.,* 478 F.Supp. at 582–83.

Plaintiff's showing on this matter is decidedly thin. The only evidentiary material she submits is the "Invocation of Privilege" by Assistant Secretary Ball, which does not directly address the harm that might be expected to flow from the disclosure of any specific document. Rather, he states in very general terms, with respect to staff analyses:

> It is essential that the PWBA investigators and those who review their reports feel free to present and discuss fully and candidly their views, analyses, opinions and recommendations, since such expressions are considered in deciding matters relating to proposed and pending enforcement actions. Disclosure of their views, analyses, opinions and recommendations would tend to discourage this exchange of candid advice and full and free expression of views, thus impeding the formulation of proper judgments by those who need and are entitled to the views and advice of their subordinates.

(Invocation at 2.) His further reference to the need for non-disclosure of investigative documents is equally general:

> In addition, the effective enforcement of ERISA also requires that information relating to the reasons for initiating investigations and the actions taken by the Department of Labor during an investigation and after it has been completed not be disclosed. The efficacy of the techniques used in conducting investigations to determine whether violations of ERISA have occurred would be reduced greatly if potential subjects of an investigation were aware of the specific manner in which investigations are conducted, and such a result would be detrimental to the public interest. Moreover, information about actions taken by the Department after an investigation has been completed directly reflects the deliberative process by which the Department makes decisions relating to the enforcement of ERISA and frequently involves communications with attorneys in the Solicitor's Office.

(*Id.* at 2–3.)

This minimal showing—with unilluminating general references to possible discouragement of candid evaluations or damage to unspecified "techniques" of investigation—is arguably insufficient to satisfy the threshold requirement that the agency offer " 'precise and certain' reasons for its

decision to withhold the documents." *Resolution Trust Corp. v. Diamond,* 773 F.Supp. 597, 604, & n. 5 (S.D.N.Y.1991) (citing cases). Even if generously construed as sufficient to meet the Department's initial burden, this type of showing is not entitled to great weight both because of the lack of corroborative detail to support the conclusory assertions and the general implausibility of the apparent assumption that any disclosure of the withheld portions of the document in question will have an effect on the Department's ability to do its job in the future. Indeed, as a general matter, the courts have increasingly questioned the notion that disclosure in discovery of internal evaluative comments by employees of an institution will significantly impede the ability of that institution to obtain a candid expression of views in the future. *See, e.g., University of Pa. v. EEOC,* 493 U.S. 182, 110 S.Ct. 577, 587–88, 107 L.Ed.2d 571 (1990) (peer review materials); *King v. Conde,* 121 F.R.D. 180, 192–93 (E.D.N.Y.1988) (police department internal investigations) (citing cases); *Hardy v. New York News, Inc.,* 114 F.R.D. at 641 (so-called self-critical analysis privilege) (citing cases).

On the other side of the balance, I note that defendants are asserting that they were materially and deliberately misled by the Department prior to the closing of the transaction. For present purposes, we must assume that defendants have pled a cognizable defense of equitable estoppel, and to attempt to prove their allegations they must be able to establish when and in what respects the Department officials in charge of the investigation of the Kroy transaction concluded that there were problems with it. Document 13 was prepared within a few weeks after the closing and after the defendants allegedly received some assurances from a representative of the Department concerning the Department's views about the transaction. Although the deleted segments of the document may not ultimately be indispensable to defendants' case, they are likely to be quite useful in this respect, and hence I conclude that the defendants' demonstrated need for the entire document outweighs the very speculative and general showing made by plaintiff with respect to any anticipated harm that might flow from disclosure of the deleted segments. In sum, the entire document must be produced.

(m) Document 14 is entitled "Analysis and Summary," and discusses aspects of the Kroy transaction. We are not given any other meaningful information about it, although plaintiff seeks to invoke both the deliberative privilege and the work-product rule.

■■ Document 14 is not protected by the deliberative privilege. Plaintiff's affiant, Assistant Secretary Ball, describes this document simply as "an internal document" which "contains opinions and analyses regarding the ESOP financed multi-investor leveraged buyout of Kroy, Inc." (Invocation at ¶ 14.) This skeletal description is insufficient to sustain a claim of deliberative privilege. In any event, even if we assume that the document was intended to assist a decision-maker in determining whether to commence litigation, its analysis has plainly been adopted. Indeed, the complaint contains a close paraphrase of that analysis. (*See* Amended Complaint at ¶¶ 39–42.) At most, the document reflects an analysis and implicit recommendation that were explicitly adopted by the decisionmaker.

■■ As for the work-product rule, plaintiff has again failed to provide any evidentiary basis for applying that rule. We are not informed who the author is, to whom the document was sent or intended to be sent, when it was prepared and sent, and what its purpose was. Given this vacuum of information, plaintiff has not remotely met her burden of proof, and there is no reliable evidentiary basis upon which to conclude that the document was prepared principally to assist in contemplated litigation.

(n) Document 15 consists of a cover memorandum that annexes a copy of Document 13, together with a brief follow-up memorandum. Since we have already addressed Document 13, I discuss only the cover memorandum and the follow-up

memorandum, for which plaintiff invokes both the deliberative privilege and the work-product rule.

The cover memorandum is addressed from the Director for Program Operations to the Assistant Secretary. It briefly summarizes the recommendation found in Document 13 and offers a parallel recommendation. That recommendation was subsequently approved (*see* follow-up memorandum included in Document 15 and Document 19) and hence the memorandum is not covered by the deliberative privilege. As for the work-product rule, plaintiff has failed to meet her burden of proof, for the same reasons as are noted with respect to Document 13.

■■■■ The follow-up memorandum is from the Director of Program Operations to the Associate Director for Enforcement. It recounts a discussion by the Director with the Assistant Secretary, and reports two decisions made by the Assistant Secretary. This document is not deliberative since it summarizes decisions already made, and plaintiff has not shown that it is work-product since there is no evidence that it was created principally to assist in anticipated litigation. Indeed, the text of the document suggests that the principal purpose was to assist an investigation, not litigation.

(*o*) Document 16 is an internal memorandum from the Director of Program Operations to the Associate Director for Enforcement. Plaintiff invokes both the deliberative privilege and the work-product rule to protect the memorandum in its entirety.

As described by Assistant Secretary Ball, the memorandum "summarizes what took place at a meeting during which the participants discussed policy issues implicated by the proposed ESOP-financed leveraged buyout of Hospital Corporation of America and expressed opinions about whether the transaction should be investigated." (Invocation at ¶ 16.) In fact, with the exception of the last two paragraphs, the document simply describes prior decisions and discussions and was not prepared to assist a policy-maker in reaching a future decision. Accordingly, except for the last two paragraphs, it is not protected by the deliberative privilege.

Plaintiff's invocation of the work-product rule is quite mystifying. There is no evidentiary basis to infer that this document was prepared to assist in contemplated litigation, and the document itself reflects no such focus. In sum, the work-product rule has not been shown to apply.

The only remaining question is whether defendants have shown a sufficient need for the last two paragraphs of the document to justify its production. They have not made any showing in this respect, and the substance of those paragraphs further indicates that defendants have no pressing need for them in making their case.

■■■■ (*p*) Document 17 is a memorandum with an attachment from the Senior Director of Policy and Legislative Analysis to the Assistant Secretary concerning a possible statement of guidance concerning the use of ESOPs in leveraged buyouts. Plaintiff invokes the deliberative privilege to withhold this document.

There is no question that the memorandum and attached draft are deliberative in nature and were prepared to assist a decisionmaker in formulating policy. Moreover, it is apparent that neither the implicit recommendations nor the analysis contained in the documents were explicitly adopted by the decisionmaker. Necessarily, then, the documents are protected by the deliberative privilege.

Defendants seek to invade the privilege by claiming that they have an acute need for these and related documents reflecting the Department's deliberations as to whether written guidance should be issued concerning the participation of ESOPs in leveraged buyouts. Defendants appear to assert two grounds for seeking these documents. First, they contend that the documents will reflect the fact that the Department had certain criteria in mind for analyzing such transactions, but chose not to disclose the standards that it had evolved. Second, they argue that whatever criteria the Department evolved will likely be probative as to the substantive content

of the statutory "adequate consideration" requirement.

Neither argument is persuasive on the current record. As for the first, defendants' assertions about secret law and related contentions that they were misled as to the Kroy transaction rest on the premise that in December 1986 the Department had evolved certain criteria on which it relied in deciding, at that time, that the ESOP's participation in the transaction was illegal. Document 17, however, is dated June 23, 1988, and it reflects a deliberative process occurring eighteen months after the closing of the Kroy transaction. If defendants were injured by the non-disclosure of so-called "secret law," this would necessarily have had to be "law" in existence in December 1986, and none of the documents that plaintiff is being permitted to withhold would assist defendants in proving the existence at that time of undisclosed but adopted substantive criteria.

As for defendants' second contention, plaintiff responds by arguing that neither she nor the Department can, in effect, be called as witnesses to testify about a pure issue of law, specifically, the meaning of the term "adequate consideration" in 29 U.S.C. § 1002(18). (See Pltff's Reply Mem. at 9 (citing *Marx & Co. v. Diners' Club, Inc.*, 550 F.2d at 508–12).) Since it is the court that must decide the applicable law, she contends that whatever views may have been expressed by the Department internally or otherwise concerning the meaning of the statutory term are by definition irrelevant.

Plaintiff's contention is, as a general proposition, correct since our Circuit Court has taken the position that it is improper to offer expert witnesses to testify as to purely legal questions governed by domestic law. *See e.g., United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir.), *cert. denied*, — U.S. —, 112 S.Ct. 63, 116 L.Ed.2d 39 (1991); *United States v. Scop*, 846 F.2d 135, 139–40, *modified*, 856 F.2d 5

(2d Cir.1988); *Marx & Co. v. Diners' Club Inc.*, 550 F.2d at 509–12.[11] There is, however, one possible set of circumstances in which discovery of the Department's internally stated views of the law might become discoverable. If the Department were to assert to the court that it should defer to the Secretary's interpretation of the statute, *see generally Connecticut Dep't of Income Maintenance v. Heckler*, 471 U.S. at 532, 105 S.Ct. at 2214, it could perhaps be argued that defendants should be given the opportunity to explore the *bona fides* of the Secretary's currently asserted interpretation, as illumined by the internal deliberations leading to that expressed viewpoint.

We need not address that question at the present time since the Secretary has not, as yet, sought such deference from the trial court. Indeed, such an argument would be difficult to maintain unless the Secretary's position was "embodied in [a] formal issuance from the agency, such as a regulation, guideline, policy statement, or administrative adjudication." *Gregory v. Ashcroft*, — U.S. —, 111 S.Ct. 2395, 2414 n. 3, 115 L.Ed.2d 410 (1991) (White, J., concurring in part). In the absence of such a formalized interpretation, the Secretary's reading of the statute amounts simply to its litigating position, which is not ordinarily entitled to deference. *See, e.g., Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212–13, 109 S.Ct. 468, 473–74, 102 L.Ed.2d 493 (1988); *St. Agnes Hosp. v. Sullivan*, 905 F.2d 1563, 1568 (D.C.Cir.1990).

Thus, for present purposes, I conclude that Document 17 need not be produced. If plaintiff intends to assert that her interpretation of the statute is entitled to deference, she shall advise defendants at least thirty days prior to the conclusion of the discovery period, and they may then raise with the court the issue of the discoverability of the internal memoranda relating to the issuance of guidelines.

---

11. This is not the case with respect to foreign country law since Fed.R.Civ.P. 44 contemplates the taking of evidence with respect to the substance of such law. *See, e.g., Galu v. Swissair: Swiss Air Transport Co.*, 734 F.Supp. 129, 131–32

(S.D.N.Y.), *aff'd*, 923 F.2d 842 (2d Cir.1990). *United States v. Maniego*, 85 Civ. 2612, 1988 WL 146552, *5 (E.D.N.Y.1988); *Olmeca, S.A. v. Manufacturers Hanover Trust Co.*, 84 Civ. 1984, 1986 WL 3517, *3 (S.D.N.Y.1986).

(p) Document 18 consists of two brief cover memoranda and a lengthier draft memorandum. The first cover memorandum is from the Senior Director of Policy and Legislative Analysis to the Assistant Secretary, and it actually annexes the draft memorandum. The later cover memorandum is from the Acting Associate Solicitor to both the Senior Director of Policy and Legislative Analysis and the Director for Program Operations. Plaintiff invokes both the deliberative privilege and the attorney-client privilege to protect the two memoranda and the draft.

The documents in question are plainly part of the deliberative process, and their substance and context make it evident that they were intended to assist a decision-maker to arrive at a policy decision. It is also apparent that neither their implicit substantive recommendations nor their analysis was ever explicitly adopted by the decision-maker. Accordingly, the documents come within the deliberative privilege. Moreover, for the reasons noted with respect to Document 17, defendants have not made an adequate showing of need to overcome the privilege.[12]

■■■ (q) Document 19 contains a memorandum from the Associate Director for Enforcement to the Acting Associate Solicitor requesting the institution of this lawsuit, together with a similar memorandum from the Chief of the Division of Investigations to the Associate Director for Enforcement. Plaintiff seeks to withhold those sections reflecting analysis of the facts or legal issues, based on the attorney-client privilege, the work-product rule and the deliberative privilege.

These memoranda plainly constitute work product and come within the deliberative privilege as well (except as to the ultimate recommendation, which was explicitly adopted). Moreover, defendants have not shown any pressing need for the deleted portions. Accordingly, they are protected from discovery.[13]

■■■ (r) Document 20 consists of a brief cover memorandum from the Associate Solicitor to the Senior Director of Policy and Legislative Analysis, together with a working draft document concerning possible guidelines affecting the use of ESOPs in leveraged buyouts. Plaintiff invokes both the deliberative privilege and the attorney-client privilege.

The cover memorandum and the draft plainly come within the scope of the attorney-client privilege since they reflect legal advice from counsel to the client. Accordingly, they are protected.[14]

■■■ (s) Document 21 consists of a cover transmittal slip and an annexed draft document from Counsel for Regulations concerning the same subject as Document 20. The memorandum is addressed to the Senior Director of Policy and Legislative Analysis. Plaintiff invokes both the deliberative privilege and the attorney-client privilege.

The underlying document comes within both privileges. It is plainly deliberative in nature and intended to assist a decision-maker to reach a policy determination. Since the analysis and implicit recommendation were apparently not adopted by the decision-maker, the document is protected absent an adequate showing of need by defendants. Defendants have not made such a showing.

In any event, the document reflects legal advice rendered by counsel to the client. For this reason as well it is protected.

(t) Document 22 consists of a cover memorandum from the Senior Director of Policy and Legislative Analysis to the Department's Counsel for Regulations, together with a draft memorandum addressing the question of published guidance concerning the role of ESOPs in leveraged buyouts. Again, plaintiff invokes both the deliberative and attorney-client privileges.

---

**12.** In view of this conclusion, I do not address the attorney-client privilege, the basis for which is less clearly spelled out in the evidentiary record.

**13.** We therefore need not address the attorney-client privilege.

**14.** We therefore do not address the applicability of the deliberative privilege.

For the reasons noted with respect to Document 21, this document is also protected.

(u) Document 23 encompasses a transmittal slip and a draft of a memorandum from the Assistant Secretary to the Policy Review Board. Plaintiff properly invokes the deliberative privilege for this document and, again, defendants have not shown an adequate need for its production at this time.

 (v) Document 24 is a memorandum from the Assistant Secretary to the Policy Review Board which addresses the question of publishing a statement of guidance. I conclude that the document is covered by the deliberative privilege and that defendants have not adequately justified invading that privilege.

## B. *The Secretary' Motion To Preclude Three Depositions*

Plaintiff's second motion for a protective order seeks to preclude defendants from conducting the depositions of three officials of the Department of Labor. These individuals are Charles Lerner, the Director of Enforcement during the relevant events; Morton Klevan, the Senior Director of ERISA Policy and Legislative Analysis; and Alan Lebowitz, the Deputy Assistant Secretary for ERISA Operations. Plaintiff contends that these individuals, whom she refers to as "high-level policy making officials" (Pltff's Mem. in Support of the Secretary of Labor's Mot. for Protective Order Preventing Deps. of High Ranking Labor Dep't Officials at 5), are likely to have no relevant information or else the information that they do have may be obtained from other officials at the Department.

 An order precluding the deposition of a witness is of course the exception rather than the rule in federal court, 4 *Moore's Federal Practice, supra,* ¶ 26.69 at 26–433 to 434, and in order to obtain such relief, the party resisting discovery must show "good cause." *Id.* at 26–434 to 435 (citing *Church of Scientology v. Cazares,* 638 F.2d 1272, 1289–90 (5th Cir. 1981)). The situation is somewhat different, however, when the party to be deposed

is a high-level government official. *See id.* at 26–442. A party may only conduct such a deposition upon a showing that the deposition is necessary in order to obtain relevant information and that it would not significantly interfere with the ability of the official to carry out his governmental responsibilities. *See, e.g., Simplex Time Recorder Co. v. Secretary of Labor,* 766 F.2d 575, 586–87 (D.C.Cir.1985) (citing cases); *Church of Scientology v. IRS,* 138 F.R.D. 9, 12 (D.Mass.1990); *United States v. Britannia S.S. Ins. Ass'n,* 86 Civ. 2554, 1989 WL 109697, *1 (S.D.N.Y.1989); *Community Fed. Sav. and Loan Ass'n v. Federal Home Loan Bank Bd.,* 96 F.R.D. 619, 621 (D.D.C.1983). However, depositions of senior officials should be allowed if they "possess[ ] particular information necessary to the development or maintenance of the party's case" which would not otherwise be reasonably obtainable. *ABC, Inc. v. United States Info. Agency,* 599 F.Supp. 765, 769 (D.D.C.1984).

In this case, plaintiff offers no affidavits by the three individuals representing that they lack knowledge of the issues concerning which defendants seek to inquire, nor does plaintiff provide evidence suggesting that brief depositions of these officials would be unduly disruptive to the workings of the Department. Rather, plaintiff appears to premise her argument on the notion that ordinarily a party may not seek to inquire into the thought processes of a governmental decision-maker, *see, e.g., United States v. Morgan,* 313 U.S. 409, 422, 61 S.Ct. 999, 1004, 85 L.Ed. 1429 (1941), or to invade the internal deliberations of the Department, and that these requested depositions are intended to accomplish precisely those impermissible objectives. *See, e.g., Simplex Time Recorder Co. v. Secretary of Labor,* 766 F.2d at 586–87.

 Defendants' showing justifies a brief deposition of only one of the three proposed deponents. Mr. Lerner was apparently involved in the decision to open an investigation of the Kroy transaction, and perhaps in the decision to challenge the

ESOP's participation in that transaction. (*See* Def.'s Consolidated Mem. in Opp'n at 26.) Accordingly, he may be able to contradict or corroborate key testimony of prior witnesses as to the status of the Department's knowledge and intentions at the time of the closing. He may also be in a position to testify concerning the policy or practice of the Department at that time in dealing with inquiries from ESOP representatives prior to the closing of such transactions. All of these are relevant and non-privileged topics. Moreover, plaintiff has not suggested that a brief deposition on these matters would materially interfere with the performance of his duties. Accordingly, for these limited purposes defendants may depose him. To minimize any conceivable disruption, defendants have already agreed to conduct the deposition at the Department and will be expected to complete their inquiry in no more than four hours.

■ There is no adequate showing by defendants of a need to depose Messrs. Lebowitz and Klevan. Although both may have been involved in later discussions of whether to issue public guidelines, defendants have not shown this to be a necessary area of inquiry. Moreover, although Lebowitz may have participated in the decision whether to undertake enforcement action concerning the Kroy transaction, the decision by the Secretary on such matters is discretionary, *see, e.g. Dillon v. Dole*, 11 Empl.Ben.Cases (BNA) 2185, 2187, 1989 WL 162389, *2 (E.D.Ark.1989), and there is no showing of any basis in this case to open up to discovery the decisionmaking process that led to plaintiff's determination to file suit here.

■ Finally, although Mr. Klevan may have offered his views to an attorney early in 1986 concerning a transaction similar to the Kroy buyout, it is not apparent why defendant cannot discover the substance of that conversation from the attorney in question. In any event, if subsequent discovery unearths a more compelling basis for conducting further discovery of these individuals, defendants can make an appropriate application.

## C. *The Secretary's Motion to Limit The Scope of Defendants' Rule 30(b)(6) Deposition*

■ In their Rule 30(b)(6) deposition notice, defendants outline thirteen topics on which they seek testimony from the Department. Plaintiff is seeking to preclude inquiry on most of these topics, essentially on the same basis as they seek to preclude the depositions of Messrs. Lerner, Lebowitz and Klevan.

■ The foregoing discussion has suggested the extent of permissible inquiry. As noted, defendants have not justified an excursion into the thought processes of officials of the Department concerning whether to open investigations of different transactions, whether to issue public guidelines, whether to provide a formal pre-closing safe harbor procedure, what criteria should govern the "adequate consideration" determination, and when to file lawsuits. In addition, a number of other topics listed by defendants are plainly overbroad or otherwise beyond the proper scope of discovery, including the Department's review of all other ESOP-financed buyouts through to the present, the Department's views about the Inspector General's May 31, 1989 report, and the history of the Department's consultation with valuation experts.

■ Defendants also seek testimony concerning the losses allegedly sustained by the Kroy ESOP as a result of Valley's asserted breach of fiduciary duty and the market value of the stock purchased by the ESOP in December 1986. Both of these are relevant areas of inquiry, and if the Department has any witnesses knowledgeable about the factual basis for such calculations, defendants may obtain deposition discovery of them now rather than waiting for the period of expert witness discovery. If, however, the only knowledgeable witnesses are individuals whose only role is as expert witnesses—that is, individuals who are prepared to analyze data supplied to them by the Department for the purpose of testifying at trial—then the Department

may make that representation to defendants' counsel and that portion of discovery will be conducted during the period for expert witness discovery.

 Finally, at the Rule 30(b)(6) deposition defendants may inquire about the procedures followed by the Department in opening and conducting investigations, as well as the specific steps taken in the Kroy investigation. This ruling is, of course, without prejudice to plaintiff's invocation of claims of privileges with respect to questions that trench upon any valid privilege asserted by plaintiff.

### D. *The Secretary's Motions to Compel*

Plaintiff has filed two related motions seeking production of a variety of documents reflecting the dealings of Valley National Bank with two law firms. A brief summary of the role of those firms is necessary to an evaluation of the parties' contentions.

The firm of Webster & Sheffield served as counsel to the Kroy ESOP starting in the Spring of 1986. The attorney principally involved in handling this account was Scott Spector, Esq.

In early December 1986, Valley was approached about the possibility of serving as Trustee for the Kroy ESOP. During this time, the leveraged buyout of Kroy was nearing fruition. Apparently the principal legal tasks in connection with that transaction, including contacts with the Department of Labor, were handled by the firm of Patterson, Belknap, Webb & Tyler, which was serving as ERISA counsel to Kappa Corporation, the entity that merged with Kroy, Inc. in connection with the buyout. (*See* Affidavit of Russell C. Gunderson, sworn to October 3, 1990, at ¶ 4.)

In mid-December 1986, a representative of Valley named Russell Gunderson flew to New York to meet, *inter alia*, with Spector prior to the Bank's decision as to whether to assume the duties of Trustee. (*See id.*) Following these discussions, the Bank formally agreed on December 17, 1986 to become Trustee. The buyout closed on December 23, 1986. (*Id.* at ¶ 9.)

In connection with its decision to become Trustee, the Bank also decided to keep Webster & Sheffield as counsel to the ESOP Trust. (*See* Affidavit of Scott P. Spector, sworn to October 3, 1990, at ¶ 8.) Apparently, however, the Bank had no further contact with the firm until February 1987, when the Bank learned that the Department had opened an investigation of the Kroy buyout. At that point, Valley contacted Webster & Sheffield, and it was agreed that the firm would represent the ESOP Trust in connection with the investigation. (*See* Affidavit of Russel C. Gunderson, sworn to Aug. 14, 1991, at ¶ 8.)

Webster & Sheffield remained counsel to the ESOP Trust until early 1990. (*See* Def.'s Mem. of P. & A. in Opp'n to Mot. to Compel at 6–7.) During this time it apparently was occasionally consulted by Valley about ESOP management issues. It also represented several Valley employees when they were deposed during the course of the Department's investigation. (*See, e.g.,* Gunderson Aff., sworn to Aug. 14, 1991, at ¶ 9.)

As for the other law firm, Snell & Wilmer, it had represented Valley in a variety of matters over a period of years prior to the Bank's appointment as Trustee to the Kroy ESOP. (*See* Affidavit of Thomas R. Hoecker, sworn to Aug. 14, 1991, at ¶ 2.) At the time that Valley was considering whether to become Trustee to the Kroy ESOP, the Bank apparently consulted with Snell & Wilmer, although it did not seek advice from the law firm specifically with respect to the propriety of the leveraged buyout. (*See id.* at ¶ 5.) After the disclosure that the Department of Labor was investigating that transaction and the Bank's role in approving it, the Bank consulted with Snell & Wilmer concerning its potential liability and how to deal with that investigation. (*See id.* at ¶ 8.) Over the following three years while the Bank was Trustee, it continued to consult with this law firm about the Department's investigation and about other matters arising from its administration of the ESOP. (*See id.* at ¶¶ 10–11.)

In 1990, the Bank requested that Snell & Wilmer become counsel for the ESOP Trust, and the firm agreed to this arrangement. (*See id.* at ¶ 12.) Before this change could be implemented, however, the Department filed the current lawsuit. (*See id.*) Apparently as a result of this filing, Valley resigned as Trustee and the law firm continued to serve as counsel to the Bank itself. (*See id.;* Pltff's Application for Order to Show Cause at ¶ 4.)

Later in 1990, Kroy, Inc. filed in the District Court of the District of Arizona for protection under Chapter 11 of the Bankruptcy Act. (*See* Pltff's Application for Order to Show Cause at ¶ 5 and Exh. B.) Following the commencement of this lawsuit by the Department, the new trustee for the Kroy ESOP—Kroy, Inc.—formally waived, on behalf of the ESOP, any claim of attorney-client privilege or work-product immunity with respect to a number of law firms, including both Webster & Sheffield and Snell & Wilmer. (*See* Pltff's Application for Order to Show Cause at Exh. A.) The Bankruptcy Court approved that waiver, and the Trustee thereafter requested that both law firms turn over to the Labor Department whatever documents relating to the issues in this case had been withheld as privileged or subject to the work-product rule. (*See id.* at Exhs. B & C.)

Despite the request of the current Trustee, both law firms and the Bank have declined to honor the Secretary's request for production of documents post-dating the closing of the Kroy buyout. Specifically, the Bank is asserting that Webster & Sheffield served as its counsel following the opening of the Department's investigation, and it has therefore directed the law firm not to turn over any documents that might come within the attorney-client privilege or the work-product rule. The firm itself has taken no position with respect to Valley's assertion of the attorney-client privilege, but does invoke the work-product rule to withhold fifty-six documents despite the instructions of the ESOP Trustee to turn over the documents. (*See* Affidavit of

Charles W. Fournier, Esq., sworn to Aug. 12, 1991, at Exh. 16.)

As for Snell & Wilmer, both the Bank and the law firm assert that Valley was a client of the firm, and that therefore the current ESOP Trustee has no standing to waive the attorney-client privilege. Both also invoke the work-product rule to withhold additional documents.

I address each of these claims *seriatim.*

1. *The Webster & Sheffield Documents*

 (a) *The Attorney–Client Privilege*

 As previously noted, the party invoking the privilege has the burden to demonstrate by competent evidence the facts underlying the privilege, including the privileged relationship. Insofar as the Bank's relationship with Webster & Sheffield is concerned, Valley has failed to establish that it was the client and thus that it has standing to invoke the attorney-client privilege.

Prior to Valley's accession to the trusteeship, Webster & Sheffield had served as counsel to the ESOP Trust. As Valley's own representative, Russell Gunderson, testified, Valley chose to continue using Webster & Sheffield as counsel to the Trust. (Gunderson Aff., sworn to Aug. 14, 1991, at ¶¶ 4, 7.) Moreover, when the Bank learned of the Department's investigation, it confirmed with Webster & Sheffield that the firm would represent the ESOP in connection with that investigation. (*See* Letter from Scott P. Spector, Esq. to Russell Gunderson, dated Feb. 18, 1987.) [15] Subsequent documents, including both correspondence and invoices, confirm that the firm viewed the ESOP as its client. Indeed, the firm listed the Trust as the client on its billings, and the fees of the firm were paid by Kroy for the Trust and were not paid by the Bank. (*See, e.g.,* Pltff's Mem. of P. & A. at Exh. A.)

It is also significant that Webster & Sheffield has offered no evidence to suggest that it ever represented the Bank in

---

**15.** The cited letter is one of the documents withheld by Valley on the asserted ground of attorney-client privilege.

its corporate capacity, as distinguished from its capacity as Trustee. Indeed, the only evidence relied upon by Valley is a statement by Gunderson that he assumed, when he dealt with Spector, that the law firm was representing the Bank and that his discussions would not be disclosed to the Labor Department. (*See* Gunderson Aff., sworn to Aug. 14, 1991, at ¶ 12.) This subjective assumption, while relevant, is hardly dispositive. *See, e.g., United States v. Keplinger,* 776 F.2d 678, 699–701 (7th Cir.1985), *cert. denied,* 476 U.S. 1183, 106 S.Ct. 2919, 91 L.Ed.2d 548 (1986); *Odmark v. Westside Bancorporation, Inc.,* 636 F.Supp. 552, 555–56 (W.D.Wash.1986).

In this case, the record reflects that Webster had represented the ESOP Trust under a prior trustee and that the Bank, upon becoming Trustee, agreed that the firm would continue to represent the ESOP Trust. The record also reflects that, during the relevant time period, the Bank utilized a separate law firm, its traditional corporate counsel, to advise it as to its legal interests in carrying out its duties as Trustee. The strong inference from this set of relationships—an inference that the Bank itself presses in seeking to protect the Snell & Wilmer documents—is that it relied on the Arizona firm to represent its own interests and that it relied on Webster & Sheffield to represent the interests of the ESOP Trust. (*See* Def.'s Mem. of P. & A. in Opp'n to Pltff's Mot. to Compel, at 11–12.)

This inference is strengthened by the absence of any evidence that the Bank specifically requested Webster & Sheffield to represent it or that the firm's attorneys understood themselves at any point to be representing the Bank in its corporate capacity. Indeed, had the law firm been requested by the Bank to represent it as well as the Trust during the course of the Department's investigation, this would have posed a serious ethical problem for the firm since the premise for the Departmental investigation was the suspicion that the Bank had breached its fiduciary and statutory duties to the Trust. Under such circumstances, if Webster & Sheffield had chosen to represent both the Trust and the Bank, it would have been in apparent violation of governing rules of professional conduct. *See* Model Code of Professional Responsibility DR 5–105(A).[16]

Under these circumstances, the court will not assume that counsel acted in plain violation of their obligation under the Code of Professional Responsibility absent convincing evidence of such misconduct. *See, e.g., Stagg v. New York City Health and Hosps. Corp.,* 162 A.D.2d 595, 596, 556 N.Y.S.2d 779, 780 (2d Dep't 1990). *Cf., e.g., Dreyer v. Dondorf,* 143 Misc.2d 760, 761, 542 N.Y.S.2d 135, 135–36 (Sup.Ct.1989). In this case, as already noted, there is no such evidence. Neither the affidavits proffered by the Bank nor the testimony of the witnesses supports the supposition that the firm undertook to represent the Bank in addition to the ESOP Trust. Moreover, the documentary evidence reflects the contrary, as does the absence of any indication of a request by the Bank for such representation, the absence of any evidence of a retainer agreement to that effect, and the absence of evidence that the Trust was ever requested to approve such dual representation or that it ever consented. Finally, I note that the withheld documents,

---

**16.** The cited provision states:

A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, or if it would be likely to involve him in representing differing interests, except to the extent permitted under DR 5–105(C).

The exception in DR 5–105(C) does not appear to be applicable in this situation since it permits representation of multiple clients with "differing interests" only "if it is obvious that" the attorney "can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each." Model Code of Professional Responsibility DR 5–105(c). In this case, where the interests of the two asserted clients would be potentially in diametrical opposition, it was not "obvious" that the firm could "adequately represent" both, and in any event there is no evidence that counsel ever gave notice to the Trust of such requested dual representation or that the Trust ever consented.

which I have reviewed *in camera,* do not offer any support for the notion that Webster & Sheffield was separately representing the Bank in its corporate capacity.[17]

In sum, I conclude that Valley was not itself a client of Webster & Sheffield, and that the sole client was the ESOP Trust. Accordingly, Valley, as former trustee, has no standing to invoke the attorney-client privilege on its own behalf to block the disclosure of documents reflecting communications with Webster & Sheffield. It necessarily follows that the current Trustee has authority to waive any attorney-client privilege that may cover these documents, and hence its formal waiver of that privilege entitles the Secretary to access to those documents unless there is a separate valid basis to withhold them.[18]

### (b) *The Work–Product Rule*

A substantial quantity of documents originating with Webster & Sheffield have been withheld based on the invocation by both Valley and the law firm of the work-product rule. For reasons already noted with respect to the attorney-client privilege, the Bank has no standing to seek the protection of this rule. Thus, the question we face is whether, in this somewhat unusual case, the law firm may invoke the work-product doctrine notwithstanding the instruction of its former client—the Kroy ESOP—to provide the relevant documents to the Department.

In its classic statement of the rationale for the protection of attorney work product, the Supreme Court noted that the doctrine was designed principally for the protection of the attorney as he served his client:

Historically, a lawyer is an officer of the court and is bound to work for the advancement of justice while faithfully protecting the rightful interests of his clients. In performing his various duties, however, it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel. Proper preparation of a client's case demands that he assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference. That is the historical and the necessary way in which lawyers act within the framework of our system of jurisprudence to promote justice and to protect their clients' interests. This work is reflected, of course, in interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs, and countless other tangible and intangible ways aptly though roughly termed by the Circuit Court of Appeals in this case as the "Work product of the lawyer." Were such materials open to opposing counsel on mere demand, much of what is now put down in writing would remain unwritten. An attorney's thoughts, heretofore inviolate, would not be his own. Inefficiency, unfairness and sharp practices would inevitably develop

---

**17.** I note that Webster & Sheffield served as counsel when the Bank was subpoenaed to testify at administrative depositions. The record reflects, however, that the Bank was subpoenaed in its capacity as Trustee (*see* Letter from Scott Spector to Russell Gunderson, dated Feb. 18, 1987) and that the firm represented it in that capacity at the depositions. There is also no evidence that the Bank identified Webster & Sheffield at the depositions as its corporate counsel or that the firm so identified itself at that time. *See, United States v. Keplinger,* 776 F.2d at 700 n. 14 (distinguishing *E.F. Hutton & Co. v. Brown,* 305 F.Supp. 371 (S.D.Tex.1969)).

**18.** Although not necessary to my holding, I note that even if Webster & Sheffield had chosen to represent the Bank as well as the ESOP Trust with respect to trust matters, this would not save Valley's invocation of the attorney-client privilege. In such a circumstance, Valley and the ESOP Trust would have been joint clients of the firm, and it is well settled that one such client cannot invoke the privilege against the other client at a later time when the clients' respective interests are in conflict. *See, e.g., Garner v. Wolfinbarger,* 430 F.2d 1093, 1103 (5th Cir.1970), *cert. denied,* 401 U.S. 974, 91 S.Ct. 1191, 28 L.Ed.2d 323 (1971); *Quintel Corp., N.V. v. Citibank, N.A.,* 567 F.Supp. 1357, 1364 (S.D.N.Y.1983); 2 *Weinstein's Evidence, supra,* ¶ 503(d)(5)[01] at 503–74 to 75; Sup.Ct.Stan. 503(d)(5). Since the Secretary is representing the ESOP in this lawsuit and the Trustee has requested that the documents be provided to her, the Bank would in any event be disabled from blocking production.

in the giving of legal advice and in the preparation of cases for trial. The effect on the legal profession would be demoralizing. And the interests of the clients and the cause of justice would be poorly served.

*Hickman v. Taylor*, 329 U.S. 495, 510–11, 67 S.Ct. 385, 393–94, 91 L.Ed. 451 (1947) (citation omitted). Now embodied in Fed. R.Civ.P. 26(b)(3), "the work product doctrine provides an attorney with a 'zone of privacy' within which to think, plan, weigh facts and legal theories, and prepare a case." *James Julian, Inc. v. Raytheon Co.*, 93 F.R.D. 138, 142–43 (D.Del.1982) (citing *Coastal States Gas Corp. v. Department of Energy*, 617 F.2d at 864; *Hercules, Inc. v. Exxon Corp.*, 434 F.Supp. 136 (D.Del.1977)).

In seeking to sustain its invocation of this rule in the present case, Webster & Sheffield argues that since the work-product doctrine is designed to protect the privacy of the attorney and his thought processes, the attorney may invoke the rule irrespective of the wishes of his present or former client. This contention cannot be sustained.

■ As is evident from the reasoning of *Hickman v. Taylor*, the purpose of the work-product protection is to safeguard the efforts of the attorney on behalf of his client by preventing an adversary counsel from obtaining a free ride on the work of the attorney. The point of the rule is to protect the integrity of the adversary process. *See, e.g., United States v. Nobles*, 422 U.S. 225, 238–39, 95 S.Ct. 2160, 2170–71, 45 L.Ed.2d 141 (1975) (rule designed to assist attorney in preparation of client's case and "orderly development and presentation" at trial). It is therefore not surprising that the very language of Rule 26(b)(3) limits its scope to discovery efforts by another party in the context of litigation. Thus the rule states in relevant part that *a party* may obtain discovery of documents . . . otherwise discoverable under subdivision (b)(1) of this rule and *prepared* in anticipation of litigation or for trial *by or for another party* . . . only upon a showing that *the party seeking*

*discovery* has substantial need of the materials.

(emphasis added).

On its face, then, the rule does not give an attorney the right to withhold work product from his own client, and in fact it has been specifically read as not requiring such a result. *See Spivey v. Zant*, 683 F.2d 881, 885 (5th Cir.1982). *Accord, Resolution Trust Corp. v. H——, P.C.*, 128 F.R.D. 647, 649–50 (N.D.Tex.1989); *Roberts v. Heim*, 123 F.R.D. 614, 630–35 (N.D.Cal.1988); 4 *Moore's Federal Practice, supra*, ¶ 26.64[2] at 26–361. *See also Maxwell v. Florida*, 479 U.S. 972, 976 n. 2, 107 S.Ct. 474, 477 n. 2, 93 L.Ed.2d 418 (1986) (Marshall, J., dissenting from denial of writ of certiorari). This result is hardly surprising in view of the evident inapplicability of the rationale for the work-product rule to an attorney's efforts to withhold the fruits of his professional labors from the client, who presumably paid for and was the intended beneficiary of those labors.

Indeed, the result for which Webster & Sheffield presses would be strikingly inconsistent with the accepted principle that an attorney is obliged to serve in a fiduciary capacity to protect the client's interests. *See United States v. Chestman*, 947 F.2d 551, 567–68 (2d Cir.1991); *Resolution Trust Corp. v. H——, P.C.*, 128 F.R.D. at 649. Having been hired to serve the client, the attorney cannot fairly be authorized to subvert the client's interests by denying to the client those work papers to which the client deems it necessary to have access. *See, e.g., Resolution Trust Corp. v. H——, P.C.*, 128 F.R.D. at 649; *Roberts v. Heim*, 123 F.R.D. at 634–35; *In re Kaleidoscope, Inc.*, 15 B.R. 232, 244 (Bankr.N.D.Ga.1981), *rev'd on other gds.*, 25 B.R. 729 (N.D.Ga. 1982). *See also John F. Matull & Assocs. v. Cloutier*, 194 Cal.App.3d 1049, 1056, 240 Cal.Rptr. 211, 215 (1987) ("attorney's work product belongs absolutely to the client"); Iowa State Bar Ass'n, Ethics Opinion No. 87–21 (1988), *reprinted in* ABA/BNA Lawyer's Manual on Professional Conduct 901:3607 ("files belong to the client."); ABA Comm. on Ethics and Professional Responsibility, Informal Op. 1376 (1977) (al-

though lawyer need not provide client with own internal notes, he "should deliver all other material which is useful to the client in benefitting fully from [the lawyer's] service[,] ... includ[ing] all significant correspondence, ... material received from third parties," and other significant documents).

In resisting this conclusion, Webster & Sheffield cites a number of court decisions that it suggests support its view of the work-product rule. (*See* Mem. of Law in Opp'n to Pltff's Application for an Order to Show Cause, at 6.) None does.

The caselaw invoked by the law firm stands for the unexceptionable proposition that the work-product rule rests on a "complex of interrelated interests" of both client and counsel, "rang[ing] from the clients' interests in obtaining good legal advice ... to the interests of attorneys in their own intellectual product." *In re Sealed Case,* 676 F.2d 793, 809 n. 56 (D.C.Cir.1982). For this reason, a number of courts have held that the attorney may invoke the work-product rule in his own right even if the client cannot assert it or has not directed counsel to assert it. *See, e.g., In re Special September 1978 Grand Jury,* 640 F.2d 49, 63 (7th Cir.1980) (attorney may invoke work-product rule even though client is barred from such invocation by crime-fraud exception); *In re Grand Jury Proceedings,* 604 F.2d 798, 801–02 & n. 4 (3d Cir. 1979).

The crucial distinction between these cases and the present one is that none involved an invocation of the rule against the client or against the client's stated wishes and interests. Indeed, the decisions cited by Webster & Sheffield make very clear that their observation about the authority of the attorney to invoke work-product protection is limited to situations in which the interests of counsel and client do not conflict in this respect. *See, e.g., In re Sealed Case,* 676 F.2d at 809 n. 56 ("To the extent that the interests [of attorneys and clients] do not conflict, attorneys should be entitled to claim privilege even if their clients have relinquished their claims"); *In re Grand Jury Proceedings,* 604 F.2d at 801–02 n. 4 ("It is not necessary to expand

upon that issue here [the effect of a client's waiver on the rule] because counsel's interests asserted in the district court are in harmony with his client's...."). *See also In re Special September 1978 Grand Jury,* 640 F.2d at 63 (attorney may invoke work-product rule although client is barred from doing so because of applicability of crime-fraud exception).

In contrast, in this case the former client has not merely waived the work-product protection applicable to documents generated by its former attorneys, but has requested the attorneys to release the documents to the Department of Labor, which is now litigating on behalf of the former client. Accordingly, any interest that Webster & Sheffield may have "in their own intellectual product" and in keeping that product secret is in direct conflict with the interest of their former client in obtaining the benefit of that product by providing it to the Department for use in this litigation.

Under these circumstances, I conclude that Webster & Sheffield cannot invoke the work-product rule to block the disclosure of requested documents to the Department of Labor pursuant to subpoena. Accordingly, plaintiff's motion to compel directed to Webster & Sheffield, and to Valley National Bank insofar as the Bank holds responsive documents, is granted.

### 2. *The Snell & Wilmer Documents*

The Secretary seeks disclosure of a quantity of documents created by the firm of Snell & Wilmer or reflecting communications between those attorneys and Valley. The Bank and the firm have resisted, asserting once again the attorney-client privilege and the work-product rule.

Analysis of this dispute is somewhat different from that addressed to the Webster & Sheffield documents. There is no question that Snell & Wilmer represented the Bank and that it never represented the ESOP Trust as such. As a result, Valley has standing to invoke the attorney-client privilege and the work-product rule, and the waiver by the current Trustee of the Kroy ESOP is not, in itself, sufficient to justify production of the withheld doc-

uments. In pressing her motion, the Secretary focusses instead on the notion that the attorney-client privilege cannot be invoked by a trustee (or former trustee) to block access by the beneficiary to communications between the trustee and any attorneys concerning the performance of the trustee's duties. The Secretary also asserts that this so-called fiduciary exception may apply to the work product rule as well, and that in any case some or all of the withheld documents are not within the scope of either the privilege or the work-product rule.

In resisting this motion, Valley argues that the fiduciary exception does not apply at all in this instance, and, in any event, does not apply unless the party seeking the discovery can also demonstrate "good cause" for piercing the privilege, a showing that Valley asserts the Secretary has failed to make. The Bank also argues that the exception does not apply to work product and that all of the withheld documents come within the scope of the privilege, the work-product rule, or both.

We start by noting that, as Trustee of the Kroy ESOP, Valley unquestionably served in a fiduciary capacity on behalf of the plan participants. *See Donovan v. Bierwirth*, 680 F.2d 263, 272 n. 8 (2d Cir.), *cert. denied*, 459 U.S. 1069, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982); Employee Retirement Income and Security Act ("ERISA"), 29 U.S.C.A. § 1002(21)(A) (West Supp. 1991). *See also United States v. Chestman*, 947 F.2d at 568. In parsing the relationship of an ERISA fiduciary to the beneficiary of the plan, the Supreme Court has instructed that we are to read ERISA in light of common-law principles governing trusts. As the Court noted:

> ERISA abounds with the language and terminology of trust law. *See, e.g.,* 29 U.S.C. §§ 1002(7) ("participant"), 1002(8) ("beneficiary"), 1002(21)(A) ("fiduciary"), 1103(a) ("trustee"), 1104 ("fiduciary duties"). ERISA's legislative history confirms that the Act's fiduciary responsibility provisions, 29 U.S.C. §§ 1101–1114, "codif[y] and mak[e] applicable to [ERISA] fiduciaries certain principles developed in the evolution of the law of

trusts." H.R.Rep. No. 95–533, p. 11 (1973).... Given this language and history, we have held that courts are to develop a "federal common law of rights and obligations under ERISA-regulated plans."

*Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 110, 109 S.Ct. 948, 954, 103 L.Ed.2d 80 (1989) (citations omitted). *See also Beck v. Levering*, 947 F.2d 639, 641 (2d Cir.1991).

The common law recognizes an obligation on the part of the trustee to provide full and accurate information to the beneficiary on his management of the trust. As part of this obligation, the trustee must make available to the beneficiary, on request, any communications with an attorney that are intended to assist in the administration of the trust. George Gleason Bogert & George Taylor Bogert, *The Law of Trusts & Trustees*, § 961 at 11 (rev. 2d ed. 1983). *See, e.g., Riggs Nat'l Bank of Washington, D.C. v. Zimmer*, 355 A.2d 709, 712–14 (Del.Ch.1976) (citing *Talbot v. Marshfield*, 2 Drew & Sm. 549, 62 Eng. Rep. 728 (Ch. 1865); *Wynene v. Humberston*, 27 Beav. 421, 54 Eng.Rep. 165 (1858); *In re Mason*, 22 Ch.D. 609 (1883)). As noted by the Delaware Chancery Court, quoting Professor Scott:

> A beneficiary is entitled to inspect opinions of counsel procured by the trustee to guide him in the administration of the trust.

*Riggs Nat'l Bank v. Zimmer*, 355 A.2d at 712 (quoting II *Scott on Trusts* § 173 at 1407 (3d ed. 1967)).

(a) *The Attorney–Client Privilege*

The implication of this conclusion for the attorney-client privilege is readily apparent. Insofar as the trustee is consulting an attorney to assist him in providing adequate service to the trust, and hence to its beneficiaries, the trustee cannot shield those communications from the beneficiaries. As explained by the Delaware Court of Chancery:

> As a representative for the beneficiary of the trust which he is administering, the trustee is not the real client in the sense that *he* is personally being served. And,

the beneficiaries are not simply incidental beneficiaries who *chance* to gain from the professional services rendered. The very intention of the communication is to aid the beneficiaries. The trustees here cannot subordinate the fiduciary obligations owed to the beneficiaries to their own private interests under the guise of attorney-client privilege. The policy of preserving the full disclosure necessary in the trustee-beneficiary relationship is here ultimately more important than the protection of the trustees' confidence in the attorney for the trust.... The fiduciary obligations owed by the attorney at the time he prepared the memorandum were to the beneficiaries as well as to the trustees. In effect, the beneficiaries were the clients of [the attorney] as much as the trustees were, and perhaps more so.

355 A.2d at 713–14 (emphasis in original).

This general conclusion appears to have been followed with some consistency in the American courts. *See, e.g., Hammond v. Trans World Airlines, Inc.,* 89 Civ. 8398, 1991 WL 93498, *2 (N.D.Ill. May 22, 1991); *Koch v. Exide Corp.,* 88 Civ. 4755, 1989 WL 49515, *1–2 (E.D.Pa. May 10, 1989); *Helt v. Metropolitan Dist. Comm'n,* 113 F.R.D. 7, 9–11 (D.Conn.1986); *Petz v. Ethan Allen, Inc.,* 113 F.R.D. 494, 496–97 (D.Conn.1985); *Washington–Baltimore Newspaper Guild v. Washington Star Co.,* 543 F.Supp. 906, 909 (D.D.C.1982). *Accord, e.g., United States v. Evans,* 796 F.2d 264, 265–66 (9th Cir.1986); *Hoopes v. Carota,* 74 N.Y.2d 716, 717–18, 544 N.Y.S.2d 808, 809, 543 N.E.2d 73, 74 (1989).[19] In substance, these courts have held that communications between trustees of a benefits plan and an attorney concerning how to manage the plan are not protected from scrutiny by the plan participants.

The one area of possible disagreement among the courts is that several, although not most, of the ERISA decisions, while recognizing that the attorney-client privilege cannot serve as an absolute bar to discovery by the ERISA beneficiary, have placed on the beneficiary the initial burden to show "good cause" to pierce the privilege. *See, e.g., Donovan v. Fitzsimmons,* 90 F.R.D. 583, 585–86 (N.D.Ill.1981) (applying *Garner v. Wolfinbarger,* 430 F.2d at 1103–04); *Hoopes v. Carota,* 142 A.D.2d 906, 909–11, 531 N.Y.S.2d 407, 410 (3d Dep't 1988), *aff'd mem.,* 74 N.Y.2d 716, 544 N.Y.S.2d 808, 543 N.E.2d 73 (1989). This "good cause" test is derived from the Fifth Circuit's decision in *Garner v. Wolfinbarger,* in which the court declined to permit defendant corporate officers in derivative suits to assert an unchallengeable attorney-client privilege because it viewed defendants as having a fiduciary duty to the corporation. In defining this corporate fiduciary exception to the attorney-client privilege, the Circuit Court ruled that the shareholders suing on behalf of the corporation could justify invasion of the privilege if the court were satisfied that there was "good cause" for such disclosure, based on consideration of such factors as the number of beneficiaries whose interests were at stake in the lawsuit, the facial adequacy and apparent good-faith of the plaintiff's claims, the importance of the information to the inquiring party's case, and whether the allegedly privileged communications concerned the very lawsuit in which discovery was sought. 430 F.2d at 1103–04. *See, e.g.,* 2 *Weinstein's Evidence, supra,* ¶ 503(b)[05] at 503–56.14 to 58. Subsequent cases have applied the *Garner* holding in a variety of fiduciary-like contexts. *See, e.g., Aguinaga v. John Morrell & Co.,* 112 F.R.D. 671, 676–79 (D.Kan.1986) (labor union); *Quintel Corp., N.V. v. Citibank, N.A.,* 567 F.Supp. at 1360–62 (land acquisition transaction). As noted, several courts have applied it as well in cases involving employment benefits plans, although with-

---

**19.** Several panels of California's mid-level appellate court have addressed the issue, but have come to conflicting results. *Compare, e.g., Gump v. Wells Fargo Bank, Nat'l Ass'n,* 192 Cal. App.3d 222, 237 Cal.Rptr. 311, 334–35 (Ct.App. 1st Dist.1987) (relying on "joint clients" exception), *with Lasky, Haas, Cohler & Munter v. Superior Court,* 172 Cal.App.3d 264, 218 Cal. Rptr. 205, 210 (Ct.App.2d Dist.1985) (legislature created an absolute protection for work product).

out specific reference to the arguable applicability of the traditional rule for trustees, which does not appear to impose such a "good cause" requirement. *See, e.g., Donovan v. Fitzsimmons,* 90 F.R.D. at 585–86 (Secretary of Labor urged application of *Garner* rule as basis for piercing privilege claim); *Hoopes v. Carota,* 142 A.D.2d at 909–11, 531 N.Y.S.2d at 410 (Appellate Division viewed *Garner* standard as more consistent with general New York views concerning attorney-client privilege).[20] *Contra, e.g., Washington–Baltimore Newspaper Guild v. Washington Star Co.,* 543 F.Supp. at 909 n. 5 (explicitly rejecting "good cause" requirement as inappropriate to trust relationship).

 · In this case, Valley's first line of defense is that Snell & Wilmer served as counsel to the Bank and not to the ESOP Trust, and hence Valley's communications with the firm are not subject to the fiduciary exception in any form. The point that Valley seems to be pressing is that the firm has traditionally represented the Bank in its corporate capacity; that the Bank deliberately chose to utilize Snell & Wilmer as its own counsel, separate from the ESOP counsel—Webster & Sheffield—and that it did so in order to be able to consult Snell & Wilmer with a view to protecting its own interests even as it served as trustee to the ESOP. As Valley argues the point, even a trustee cannot fairly be denied the ability to protect its own interests by consulting in confidence its own privately hired attorneys. ₀

In response, the Secretary asserts that Valley's argument, if accepted, would permit a trustee to avoid any scrutiny by the beneficiaries of the legal advice that it was seeking and obtaining in connection with the performance of its duties. According to the Secretary, by retaining an attorney paid by the trust as nominal counsel while at the same time maintaining a separate relationship with another firm to which it actually looked for guidance in carrying

out its fiduciary duties, the trustee could improperly shield the very communications that the law of trusts instructs must be available to the beneficiaries of the trust. The Secretary does not deny that there may be instances in which the trustee needs confidential advice to protect its own interests when they diverge from that of the beneficiaries, and thus she presses the view that the fiduciary exception does not apply to communications between the trustee and its own counsel insofar as those communications concern a matter as to which the trustee and the beneficiary have potentially conflicting interests. Applying that rule to this case, the Secretary argues that Valley may shield its communications with Snell & Wilmer insofar as they concerned the Department's investigation of the Kroy buyout, since that inquiry was premised on the suspicion that the Bank had violated its fiduciary duties to the ESOP Trust, but that any communications by the Bank with the firm seeking advice as to the administration of the Trust should be disclosable to the Secretary, who is suing on behalf of the beneficiaries of the Trust. *See, e.g., Donovan v. Fitzsimmons,* 90 F.R.D. at 586.

From the current record, it is apparent that Snell & Wilmer was retained directly by the Bank and that over a period of time preceding the Bank's appointment as Trustee, the firm counselled the Bank solely to protect the interests of the Bank. Following Valley's assumption of the trusteeship, it appears that the Bank continued to utilize Snell & Wilmer at least in part in its traditional role as advisor with respect to the interests of the Bank, including its interests with regard to the investigation by the Department of Labor. It also appears, however, from both the withheld documents and the testimony of Bank and law firm employees that Snell & Wilmer provided advice to the Bank concerning its management of the Trust on an ongoing basis and in connection with matters as to which there is no suggestion of a potential

---

**20.** The New York Court of Appeals affirmed the Appellate Division's decision in *Hoopes* without explicitly ruling on the question of which standard was applicable since the Appellate Division

had found good cause to pierce the privilege. *See* 74 N.Y.2d at 718, 544 N.Y.S.2d at 809, 543 N.E.2d at 74.

conflict or divergence of interest between the Trustee and the beneficiaries of the ESOP Trust. (*See, e.g.,* Hoecker Aff. at ¶¶ 10–11; Snell & Wilmer Docs. ## 101113 and 101959.) Moreover, from the documents it appears that Valley was using Snell & Wilmer in connection with these matters in a manner comparable to its use of Webster & Sheffield, counsel for the ESOP Trust. Indeed, it appears that the Bank undertook joint meetings with attorneys from both firms to obtain advice on trust management issues. (*See, e.g.,* Snell & Wilmer Docs. ## 114083–4, 114086, 101959, 102579.) This conclusion is consistent with Valley's own description of the role that Snell & Wilmer was called upon to play—a role that apparently involved giving advice that was designed to benefit the ESOP Trust. (*See, e.g.,* Affidavit of Paul W. Knowles, sworn to Aug. 12, 1991, at ¶ 4. *See also* Hoecker Aff. at ¶ 10.)

Under these circumstances, Valley cannot invoke the traditional absolute attorney-client privilege to bar disclosure to the beneficiaries of the ESOP Trust of its communications with Snell & Wilmer insofar as those discussions were addressed to issues of trust management. The relevant standard is found in the law of trusts. As noted by Bogert & Bogert,

> The beneficiary . . . has a right to obtain and review legal opinions given the trustee to enable the trustee to carry out the trust, except for such opinions as the trustee has obtained on his own account to protect himself against charges of misconduct.

*The Law of Trusts & Trustees, supra,* § 961 at 11. This limitation is echoed in the Restatement (Second) of Trusts in terms particularly pertinent to this case:

> § 173 DUTY TO FURNISH INFORMATION
>
> The trustee is under a duty to the beneficiary . . . to permit him or a person duly authorized by him to inspect the subject matter of the trust and the accounts and vouchers and other documents relating to the trust.
> Comment:
> \* \* \* \* \* \*

> b. What need not be communicated. The trustee is privileged to refrain from communicating to the beneficiary information acquired by the trustee at his own expense and for his own protection. Thus, he is privileged to refrain from communicating to the beneficiary opinions of counsel obtained by him at his own expense and for his own protection.

Restatement (Second) of Trusts § 173 (1959). *Accord, e.g., Riggs Nat'l Bank of Washington D.C. v. Zimmer,* 355 A.2d at 712.

■■■■ It is not clear that Valley satisfies the first part of this test since Kroy itself apparently paid the fees for Snell & Wilmer. (*See* Snell & Wilmer Docs. ## 101564, 104681.) Nonetheless, I assume *arguendo,* that these payments were made pursuant to a provision of the Trust agreement that authorized the Trustee to hire its own counsel at Kroy's expense. (*See* Snell & Wilmer Doc. # 104681.) The hiring of separate counsel is relevant to and probative of Valley's implicit contention that Snell & Wilmer was hired "for [Valley's] protection." *Cf. Riggs Nat'l Bank of Washington, D.C. v. Zimmer,* 355 A.2d at 711–12 (noting that payment of firm from trust assets "is a significant factor" in deciding who are "the real clients."). Nonetheless, because the central focus is functional—that is, what role the attorney actually played—the hiring of separate counsel by the Trustee is not dispositive. In this case, Valley's use of Snell & Wilmer as parallel and at times joint counsel with the ESOP counsel, and ultimately Valley's apparently principal reliance on Snell & Wilmer in 1988 and 1989 to advise on trust issues as to which there was no conflict with the trust beneficiaries, indicate that Valley was obtaining the opinions of Snell & Wilmer "to guide [it] in the administration of the trust." II *Scott on Trusts* at § 173, quoted in *Riggs Nat'l Bank of Washington, D.C. v. Zimmer,* 355 A.2d at 712. Accordingly, insofar as the discussions did not concern the Department of Labor investigation, the fiduciary exception to the attorney-client privilege may be invoked by the Department of Labor since

it is serving as "a person duly authorized by [the beneficiary] to inspect ... documents relating to the trust." *Restatement (Second) of Trusts* § 173.

 Valley's second line of defense is its assertion that the Secretary must demonstrate "good cause," and that she cannot do so. There are two answers to this contention. The first is that the "good cause" test of *Garner* is not applicable to a trustee-beneficiary relationship. The *Garner* test was devised in the significantly different context of a shareholder derivative suit, and the concerns animating the Fifth Circuit's decision there are not applicable here. In a corporate setting, the officers serve the corporation directly but the shareholder only indirectly, and there are likely to be significant differences of interests among different classes of shareholders. As one commentator has noted:

> [T]he facts of life are that antagonism between the derivative plaintiff and those who really run (i.e. are) the corporation is a common phenomenon.
>
> Unless the stockholder owns a substantial block of shares, the advantages stemming from his victory in the litigation will outweigh any harm that would accrue to him from a decrease in the value of his stock. His desire to prove his claim may lead him to seek information which would be highly detrimental to the corporation if it were available to the public.

2 *Weinstein's Evidence, supra,* ¶ 503(b)[05] at 503–56.14. (footnote outlined).

Under these circumstances, the Fifth Circuit was properly concerned not to permit harassing efforts by a shareholder "in matters purely of judgment," 430 F.2d at 1101, and the court's eludication of the "good cause" requirement—which includes, *inter alia,* consideration of "the number of shareholders and the percentage of stock they represent," *id.* at 1104, as well as, for example, the *bona fides* of the claims asserted and the risk of disclosure of "trade secrets or other information in whose confidentiality the corporation has an interest," *id.*—is properly responsive to the concerns posed by the context in which the privilege was being challenged.

In contrast, these concerns are not readily applicable in a trust context. Indeed, "[i]n a trustee relationship there exists no legitimate need for a trustee to shield his actions from those whom he is obligated to serve." *Washington–Baltimore Newspaper Guild v. Washington Star Co.,* 543 F.Supp. at 909 n. 5. It is thus not surprising that the common-law principles governing required disclosure of trustee communications do not impose a "good cause" limitation on the beneficiary's access to this type of information, and neither *Garner* nor its progeny offer the slightest suggestion as to why that long-settled principle ought now to be set aside.

 The second answer to Valley's argument is that, even if some variant of the *Garner* "good cause" requirement is applicable here, the Secretary has satisfied it. The Secretary represents, in effect, all of the trust beneficiaries and they hold one hundred percent of the interest in the Trust. Moreover, the claims of fiduciary breach asserted by the Secretary are legally sufficient on their face, and there is no reason in the record to question the *bona fides* of the Secretary in asserting those claims.[21] Furthermore, the Secretary's allegations, if true, reflect serious failings by the Bank in carrying out its fiduciary obligation as Trustee to the ESOP. I also note that the communications that would be encompassed within the fiduciary exception do not reflect advice concerning this litigation, and Valley has not shown that the disclosure would reveal any trade secrets or otherwise adversely affect the Trust. Indeed, it is worth noting that at least some of those communications involved discussions with Webster & Sheffield, which

---

**21.** I note that Valley speculates that the Secretary deliberately misled the Bank with regard to its views of the buyout, possibly in an effort to appease critics in the General Accounting Office or in Congress. Whether or not this accusation is true, the current evidentiary record—including the documents withheld by the Secretary until now and submitted to the court for *in camera* inspection—do not support it.

represented the ESOP Trust, and that the Secretary is now also representing the ESOP Trust. Finally, the nature of the communications sought are reasonably and specifically identified, and reflect very relevant information—specifically, the degree to which the ESOP Trust was in fact in a position to exercise corporate control of Kroy, as Valley claims it was in explaining the high price paid by the ESOP for its share of Kroy, Inc.

In sum, I conclude that, to the extent that the documents reflect communications between Valley and Snell & Wilmer about subjects other than the Departmental investigation of the Kroy buyout, the Bank cannot invoke the attorney-client privilege to block their disclosure to the Secretary.[22] There remains for consideration the question of the work-product rule, which is also asserted by Valley and Snell & Wilmer with respect to many of the same documents.

#### (b) *The Work–Product Rule*

The criteria for application of the work-product rule have been summarized and need not be repeated here. Although the parties are in dispute as to whether the fiduciary exception applies to work product, we need not address that issue here because, in this case, the normal limitations to the work-product rule and the limitations that would be imposed by the fiduciary exception, if it is applicable, are coextensive.

■ Since Valley must demonstrate that the documents for which it claims work-product protection were prepared for the principal purpose of assisting in anticipated or pending litigation, those documents that relate to the Labor Department investigation would seem to fit within the work-product category in view of the testimony of Valley's counsel and employees. (*See* Gunderson Aff., sworn to Aug. 14, 1991, at ¶ 8; Hoecker Aff. at ¶ 8.) By the same token, the fiduciary exception

would not apply to these documents since Valley had a potential conflict of interest with the Trust beneficiaries with respect to the Labor Department investigation.

■ In contrast, the documents concerning other issues—typically ESOP management and restructuring of Kroy, Inc.—have not been shown to have been prepared in anticipation of litigation. The only other subject matter to which Valley alludes as being within the ambit of the work-product rule concerns the possible bankruptcy of Kroy, Inc. Valley's showing in this regard fails to demonstrate the applicability of the rule for two reasons. First, the affidavits and other evidence proffered by the Bank do not attempt to establish that any of the documents reflecting possible concerns about the Kroy bankruptcy were prepared to assist the ESOP in adversarial litigation within the context of the bankruptcy proceeding. Second, a review of the documents themselves reflects that they were apparently prepared principally or solely to assist Valley in handling the affairs of the ESOP in the event of a bankruptcy filing by Kroy, and were not designed to assist any contemplated litigation.

In sum, the work-product rule protects only those documents relating to the investigation by the Labor Department of the Kroy buyout.

#### 3. *Summary of the Snell & Wilmer Documents to be Produced*

As noted, I have reviewed the documents relating to the representation of Valley by Snell & Wilmer, together with the evidentiary record proffered by Valley in support of its opposition to disclosure of those documents. That evidentiary record does not address the documents with any specificity, although the Bank does proffer a set of privilege lists. Bearing in mind the governing criteria outlined above and the burden of proof that rests on the Bank, I conclude that, of the documents submitted

---

**22.** If Valley believes that dissemination of some of these documents beyond the Department could adversely affect its legitimate interests, it may submit a proposed or consented-to protective order limiting the use that may be made of the documents.

for *in camera* inspection, the following may be withheld to the extent noted

101447

114649

102547 (only third paragraph)

102579 (only paragraph "3")

104649

105403

105796

105466 (only first page)

104681

Virtually all the remaining documents reflect consultations about trust management, including such issues as the possible restructuring of Kroy, concerning which there is no suggestion of any conflict or even divergence of interest between Valley and the Trust beneficiaries. Moreover, a comparison with the Webster & Sheffield documents indicates that Valley was looking to Snell & Wilmer as the primary legal consultant in 1988 and 1989 with regard to matters of trust administration; specifically, the Webster & Sheffield documents generally do not refer to these matters whereas there is a substantial body of Snell & Wilmer documents that do.

Finally, I note that a significant number of the documents would, in any event, not be protected by the attorney-client privilege or work-product rule. These include, for example, memoranda within the Bank referring to the payment of legal fees, memoranda or notes simply reporting that a meeting was to be held, and summaries of meetings in which counsel for the ESOP participated. These matters need not be addressed, however, since, in any event, the documents are not exempt from scrutiny by the Trust beneficiaries and hence by their designated representative in this suit, the Secretary of Labor.

## CONCLUSION

For the reasons stated, the motions by the plaintiff Secretary of Labor for protective orders and for orders compelling further disclosure by defendant Valley National Bank and Webster & Sheffield are granted in part and denied in part, to the extent indicated. The documents required to be produced by both sides are to be made available within two weeks.

SO ORDERED.